Argued May 6; affirmed October 19, 1948

# AMPHITHEATERS, INC. *v.* PORTLAND MEADOWS, A CORPORATION
## 198 P. (2d) 847

*James Arthur Powers,* of Portland; and *Byron C. Congdon,* of Seattle, Washington, argued the cause for appellant. With them on the brief was Kenneth Kraemer, of Portland.

*Vern Dusenbery,* of Portland, argued the cause for respondents. On the brief were Crum, Dusenbery and Martin, of Portland.

Before ROSSMAN, Chief Justice, and LUSK, KELLY, BAILEY and BRAND, Justices.

BRAND, J.

At the trial, evidence to the following effect was introduced. During the summer of 1945 the defendant commenced arrangements for the purchase of land and the construction thereon of a one-mile race track. On 25 August, 1945, an option for the purchase of 21 acres of the required land was secured from H. M. Seivert who is one of the promoters of the theater project and is the owner of the land on which the theater is situated. On 15 October, 1945, defendant applied for a license to

operate a race meet to be held in May, 1946, and the license was issued. In October and early November, 1945, extensive newspaper publicity was given to the race track project, featuring the fact that the property would be lighted for night racing. On 15 October, 1945, a contractor was employed to plan and construct the race track and the facilities incidental thereto. Grading was commenced in November and the work was continued until the project was completed on 14 September, 1946.

During the fall of 1945 the land on which the plaintiff's theater is located was being prepared and equipped for night auto racing by Northwest Sports, Inc.; an activity which, like that of defendant, would have involved the use of flood lights. On 29 November, 1945, a lease agreement was executed between Northwest Sports, Inc. and the promoters of the plaintiff corporation, entitling the lessees and their assignee, Amphitheaters, Inc., to construct and operate a drive-in outdoor motion picture theater upon the property adjoining the race track of defendants. But the lease provided that the operation of the theater must not interfere with the operations of the same property for auto racing. Plans for the construction of the theater were turned over in March, 1946, and construction was commenced in May or June of that year. At least some of the promoters of the theater project knew that the race track was to be lighted for night racing, though they may not have known the volume or extent of the proposed lighting.

The outdoor theater was completed and commenced operating on 31 August, 1946. The race track was completed and the first races held fifteen days later. The plaintiff invested $135,000 in the construction of

the outdoor theater and sums greatly in excess of that amount were expended by the defendant in the development of the race track and facilities. The lighting facilities alone involved an investment by the defendant of $100,000. The two tracts operated by plaintiff and defendant respectively are located just north of the city limits of Portland, Oregon. They adjoin and lie between two arterial highways, Denver Avenue and Union Avenue. The defendant's track consists of a mile-long oval extending in a general northerly and southerly direction. The auto race track which encloses the plaintiff's moving picture amphitheater lies between Union Avenue and the Northeast curve of the defendant's oval track. Union Avenue runs in a northwesterly direction along and parallel to the plaintiff's property of which it forms the northeasterly boundary. The theater screen, approximately 40 feet high and 50 feet wide, is backed up against the westerly line of Union Avenue and faces slightly south of west and directly toward the defendant's race track. At the trial a photograph showing the relative positions of the two properties and the nature of the adjacent territory was offered in evidence by the plaintiff and received without objection. It fairly represents the true situation. It is reproduced as a part of this opinion to illustrate the facts giving rise to our problem. The picture was taken from a point on defendant's property. The northeasterly portion of defendant's oval track appears in the foreground. The camera was aimed directly at the screen of plaintiff's theater. Far better than words, the picture indicates the character of the area in which the two properties are located.

In installing outdoor moving picture theaters, it is necessary to protect the premises from outside light

interference. For that purpose the plaintiff constructed wing fences for a considerable distance on each side of the screen and along the westerly line of Union Avenue for the purpose of shutting off the light from the cars traveling on that arterial highway. It was also necessary to construct a shadow box extending on both sides and above the screen for the purpose of excluding the light from the moon and stars. The testimony indicates that the construction of the shadow box was necessary if a good picture was to be presented on the screen. The extreme delicacy of plaintiff's operation and the susceptibility of outdoor moving pictures to light in any form was conclusively established by the evidence.

In order to illuminate the defendant's track for night horse racing, approximately 350 1500-watt lights are mounted in clusters on 80-foot poles placed at intervals of approximately 250 feet around the track. The flood lights are in general, directed at the track, but there is substantial evidence to the effect that reflected light "spills" over onto the plaintiff's premises and has a serious effect on the quality of pictures shown on the screen. The nearest cluster of lights on the defendant's track is 832 feet distant from the plaintiff's screen. The light from the defendant's track not only impairs the quality of the pictures exhibited by the plaintiff, but there is also substantial evidence that plaintiffs have suffered financial loss as the result of the illumination of which they complain. On one occasion at least, plaintiffs felt themselves required to refund admission fees to their patrons on account of the poor quality of the picture exhibited. The evidence discloses that the light from the defendant's race track when measured at plaintiff's screen is approximately that of full moonlight.

Upon the opening of the racing season in September, 1946, the plaintiff immediately complained to the defendant concerning the detrimental effect of defendant's lights, and shortly thereafter suit was filed. In the fall of 1946 the defendant, while denying liability, nevertheless made substantial efforts to protect the plaintiff from the effect of defendant's lights. One hundred hoods were installed on the lights, and particular attention was given to those nearest to the plaintiff's property. In 1947, and prior to the spring racing season, which was to last 25 days, thirty louvers were also installed for the purpose of further confining the light to the defendant's property. These efforts materially reduced, but did not eliminate the conditions of which plaintiff complains.

■■ Plaintiff contends that the defendant, by casting light equivalent to that of a full moon upon plaintiff's screen has committed a trespass upon real property and error is assigned by reason of the failure of the court to submit to the jury the question of trespass. While the dividing line between trespass and nuisance is not always a sharp one, we think it clear that the case at bar is governed by the law of nuisance and not by the law of trespass. Under our decisions every unauthorized entry upon land of another, although without damage, constitutes actionable trespass. *Kesterson v. California-Oregon Power Co.*, 114 Or. 22, 228 P. 1092; *Huber v. Portland Gas & Coke Co.*, 128 Or. 363, 274 P. 509; 52 Am. Jur., Trespass, § 47, p. 872; Restatement of the Law of Torts, Vol. 1, § 158, p. 359. The mere suggestion that the casting of light upon the premises of a plaintiff would render a defendant liable without proof of any actual damage, carries its own refutation. Actions for damages on account of smoke,

noxious odors and the like have been universally classified as falling within the law of nuisance. In fact, cases of this type are described in the Restatement of the Law as "non trespassory" invasions. Restatement of the Law of Torts, Vol. 4, Ch. 40, p. 214, et seq.

Many of the cases on which plaintiff relies in support of its theory of trespass involve the flight of airplanes at low level over plaintiffs' land. The modern law with reference to trespass by airplanes has developed under the influence of ancient rules concerning the nature of property. Ownership of lands, it has been said, "includes, not only the face of the earth, but everything under it or over it, and has in its legal signification an indefinite extent upward and downward, giving rise to the maxim, Cujus est solum ejus est usque ad coelum". 50 C. J. 752, Property, § 24. Harmonizing the ancient rule with the necessities of modern life, the Restatement of the Law declares that one who intentionally and without a privilege enters land, is a trespasser. Restatement of the Law of Torts, Vol. 1, § 158, p. 359. Air travel over a plaintiff's land is still recognized as trespass prima facie imposing liability but the rights of airplane travel are established or recognized by the doctrine of privilege. Restatement of the Law of Torts, §§ 158, 159, 194.

In support of its theory of trespass, the plaintiff cites *Swetland v. Curtiss Airports Corporation,* 55 F. (2d) 201, 83 A. L. R. 319; *United States v. Causby,* 328 U. S. 256, 90 L. ed. 1206; and *Guith v. Consumers Power Co.,* 36 F. Supp. 21. They are all cases which involve the flight of airplanes and which reflect the influence of the ancient rules of ownership ad coelum as modified by the rules of privilege set forth in the Restatement. The historical background of these cases dis-

tinguishes them from the non trespassory cases which are controlled by the law of nuisance. *Portsmouth Harbor Land & Hotel Co. v. United States,* 260 U. S. 327, 67 L. Ed. 287, was similar in principle to the Causby case, supra. The case involved a taking by the United States by means of the continuous firing of artillery over the petitioners' land. We need not argue the distinction between a cannon ball and a ray of light. Upon this issue plaintiff also cites *National Refining Co. v. Batte,* 135 Miss. 819, 100 So. 388, 35 A. L. R. 91, and *The Shelburns, Inc. v. Crossan Corporation,* 95 N. J. Eq. 188, 122 Atl. 749, both of which cases involve the shedding of light upon defendant's property, but both were decided upon the theory of nuisance and not of trespass. They will be considered later. We have considered the other cases cited in support of the theory of trespass and find them not in point.

As its second assignment, the plaintiff asserts that the trial court erred in failing to submit the case to the jury on the theory of nuisance.

■ This is a case of first impression. It differs in essential particulars from any case which has received consideration by this court. The nuisance cases appearing in our reports fall into four easily recognizable classes: (1) Cases involving harm to human comfort, safety or health by reason of the maintenance by a defendant upon his land of noxious or dangerous instrumentalities causing damage to the plaintiff in respect to legally protected interests of the plaintiff in his land. (2) Cases involving illegal or immoral practices, most of them being public as distinct from private nuisances. They relate to bawdy houses, gambling, abortions, lotteries, illegal possession of liquor, and acts outraging public decency. (3) Cases

involving obstructions to streets, public ways, common rights, access to property and the like. (4) Cases involving damage to the land itself, as by flooding. The cases, with the exception of those falling in the first class, bear no resemblance to the one at bar, and require no further comment.

· As falling within the first class, we find the following Oregon cases: *Fleischner v. Citizens' Real Estate Investment Co.*, 25 Or. 119, 35 P. 174, (filth and sewage seepage on adjacent property); *Portland v. Cook*, 48 Or. 550, 87 P. 772, (slaughter house); *Ulmen v. Town of Mt. Angel*, 57 Or. 547, 112 P. 529, (pollution of adjacent surface water); *Borne v. Wilson-Case Lumber Co.*, 58 Or. 48, 113 P. 52, (ashes and cinders); *Templeton v. Williams*, 59 Or. 160, 116 P. 1062, (noxious odors and flies from barn); *Smith v. Silverton*, 71 Or. 379, 142 P. 609, (stream pollution); *Dibert v. Giebisch*, 74 Or. 64, 144 P. 1184, (dynamite); *Porges v. Jacobs*, 75 Or. 488, 147 P. 396, (livery stable); *Phipps v. Rogue River Canal Co.*, 80 Or. 175, 156 P. 794, (stagnant water dangerous to health); *Adams v. Clover Hill Farms*, 86 Or. 140, 167 P. 1015, (noxious odors); *Wilson v. City of Portland*, 153 Or. 679, 58 P. (2d) 257, (foul odors); *Adams v. City of Toledo*, 163 Or. 185, 96 P. (2d) 1078, (fire); *Lindley v. Hyland et al.*, 173 Or. 93, 144 P. (2d) 295, (smoke and cinders); *Arneil v. Schnitzer*, 173 Or. 179, 144 P. (2d) 707, (fire); *Kramer v. Sweet*, 179 Or. 324, 169 P. (2d) 892, (slaughter house).

The cases listed in the first class are the only ones which bear any faint resemblance to the case at bar. Examination of those cases will disclose that no Oregon decision has ever held that the casting of light in any quantity or form upon the land of another gives rise to a cause of action upon any legal theory. If the cases

involving smoke, noxious odors, flies and disease germs are claimed to be analogous to the case at bar, it must be answered that in every case the activity or thing which has been held to be a nuisance has been something which was, 1, inherently harmful, and 2, an unreasonable and substantial interference with the ordinary use or enjoyment of property. No one can contend that light is inherently harmful to persons in the ordinary enjoyment of property.

Since there is no Oregon precedent to support plaintiff's contention, we must go back to fundamental principles. Plaintiff relies upon the general definition of a nuisance as set forth in *Adams v. City of Toledo,* supra, and *State ex rel Rudd v. Ringold,* 102 Or. 401, 202 P. 734. A private nuisance is defined as "anything done to the hurt, annoyance or detriment of the lands or hereditaments of another, and not amounting to a trespass". Definitions in such general terms are of no practical assistance to the court.

> "It has been said that the term 'nuisance' is incapable of an exact and exhaustive definition which will fit all cases, because the controlling facts are seldom alike, and each case stands on its own footing. * * *" 39 Am. Jur., § 2, p. 281.

This court has repeatedly quoted the ancient maxim, Sic utere tuo ut alienum non laedas. *Templeton v. Williams; Bourne v. Wilson-Case Lumber Co.; Portland v. Cook,* all supra. In this connection we quote the words of Lord Esher in *Yarmouth v. France,* 19 Q. B. D. 647, 653, 17 E. R. C. 217, as follows:

> "I need hardly repeat that I detest the attempt to fetter the law by maxims. They are almost invariably misleading; they are for the most part so large and general in their language that they

always include something which really is not intended to be included in them."

And to this we add the crisp comment of Justice Holmes:

"Decisions * * * often are presented as hollow deductions from empty general propositions like sic utere tuo ut alienum non laedas, which teaches nothing but a benevolent yearning." 8 Harv. L. Rev. 3.

See also, Jeremiah Smith, Reasonable Use of One's Own Property As a Justification for Damage to a Neighbor, 17 Col. L. Rev. 383.

The statement of Addison, Torts, 8th Ed. 66, that "The due regulation and subordination of conflicting rights constitute the chief part of the science of law" is peculiarly applicable in the field of private nuisance, for the rights of neither party in the use and enjoyment of their respective properties are absolute.

"What is a reasonable use and whether a particular use is a nuisance cannot be determined by any fixed general rules, but depend upon the facts of each particular case, such as location, character of the neighborhood, nature of the use, extent and frequency of the injury, the effect upon the enjoyment of life, health, and property, and the like." 39 Am. Jur. 298, § 16.

■■ Notwithstanding the fact that the existence vel non of a nuisance is generally a question of fact, there have arisen several rules of law which guide and sometimes control decision. It is established law that an intentional interference with the use and enjoyment of land is not actionable unless that interference be both substantial and unreasonable. Restatement of the Law of Torts, Vol. 4, § 822, Comment g, and § 826, comment a.

■ Again it is held that whether a particular annoyance or inconvenience is sufficient to constitute a nuisance depends upon its effect upon an ordinarily reasonable man, that is, a normal person of ordinary habits and sensibilities, *Stoddard v. Snodgrass,* 117 Or. 262, 241 P. 73; 39 Am. Jur., Nuisances, § 31, citing many cases; *Kellogg v. Mertens,* (La. App.), 30 So. (2d) 777; *Kimball v. Thompson,* 70 F. Supp. 803; *Columbian Carbon Co. v. Tholen,* (Tex. Civ. App.), 199 S. W. 825; *Metropoulos v. MacPherson,* 241 Mass. 491, 135 N. E. 693; *Price v. Grantz,* 118 Pa. St. 402, 4 Am. St. Rep. 601; *Walker v. Wearb,* 6 N. Y. S. (2d) 548; *Kentucky & West Virginia Power Co. v. Anderson,* 288 Ky. 501, 156 S. W. (2d) 857. The doctrine upheld in the above cited cases appears to have had its origin in Aldred's Case, (1601) 9 Coke 57b, 77 Eng. Reprint 816. The rule announced in that case, "Lex non favet delicatorum votis", was quoted with approval by this court in *Kramer v. Sweet,* supra. This doctrine has been applied in many cases involving smoke, dust, noxious odors, vibration and the like, in which the injury was not to the land itself but to the personal comfort of dwellers on the land.

It is highly significant that an identical principle has been applied where the uses to which a plaintiff puts his land are abnormally sensitive to the type of interference caused by the defendant.

■ "No action will lie for a nuisance in respect of damage which, even though substantial, is due solely to the fact that the plaintiff is abnormally sensitive to deleterious influences, or uses his land for some purpose which requires exceptional freedom from any such influences * * *

"So if I carry on a manufacture or other business which is so sensitive to adverse influences that it suffers damage from smoke, fumes, vibrations, or heat, which would in no way interfere with the

ordinary occupation of land, the law of nuisance will not confer upon me any such special and extraordinary protection. I must acquire immunity from damage of this sort by special contract with my neighbours. Thus, in Eastern & South African Telegraph Co. v. Cape Town Tramways Co., (q) an action was brought by the telegraph company for interference with its telegraphic operations through induced currents caused by the working of the defendants' electric cars. The Judicial Committee of the Privy Council held the defendants not liable on the ground that such a cause would do no harm to the ordinary occupation of land, and that the damage done was solely due to the exceptionally delicate nature of the operations conducted by the plaintiffs. 'A man cannot increase the liabilities of his neighbour by applying his own property to special uses, whether for business or pleasure' (r). The same principle was acted on by the Court of Appeal in Robinson v. Kilvert (s), where the nuisance complained of was one of heat causing damage to the exceptionally delicate manufacture of the plaintiff.'' Salmond on the Law of Torts, 9th Ed., pp. 238, 239.

The same rule has been laid down by another author:

''It has been shown that the interference with property or personal comfort must be substantial. But even if the interference is substantial, no action will lie where it can be shown that, but for the infirmity of the person or property, there would have been no substantial interference * * * Nor again can damage to sensitive property be complained of if the act causing the damage would not have harmed more ordinary things * * *''. Pearce and Meston, Ch. 1, p. 19.

The same doctrine is followed by Joyce, Law of Nuisances, § 26:

'' * * * But the doing of something not in itself noxious does not become a nuisance merely because

it does harm to some particular trade of a delicate nature in the adjoining property where it does not affect any ordinary trade carried on there nor interfere with the ordinary enjoyment of life. A man who carries on an exceptionally delicate trade cannot complain because it is injured by his neighbor doing something lawful on his property, if it is something which would not injure an ordinary trade or anything but an exceptionally delicate trade.''

To the same effect see Prosser on Torts, p. 559, and note p. 67. See 39 Am. Jur. 424; 46 C. J. 682.

In *Bradbury Marble Co. v. Laclede Gas Light Co.,* 128 Mo. App. 96, 106 S. W. 594, the court said:

" * * * Plaintiff had the legal right to stack its marble on its yard, and to leave it uncovered. Defendant had the legal right to operate its gas machines in a careful and skillful manner, and to discharge such substances therefrom as were not injurious to the neighboring property when used in the usual way. Therefore, if plaintiff is making an unusual use of its yard, in view of the fact that it is located in a district largely devoted to manufacturing purposes, or if the marble it stacks in its yard is of such a delicate nature as to become stained and injured from substances discharged from the smokestacks of factories by which it is surrounded, it ought not to recover. * * *''

And see *Pennsylvania Co. v. Sun Co.,* 290 Pa. 404, 138 Atl. 909; *Lake Shore & M. S. Ry. Co. v. Chicago, L. S. & S. B. Ry. Co.,* 48 Ind. App. 584, 92 N. E. 989; *Postal Telegraph Cable Co. v. Pacific Gas & Electric Co.,* 202 Cal. 382, 260 P. 1101; and *Cremidas v. Fenton,* 223 Mass. 249, 111 N. E. 855.

In *Cooke v. Forbes,* 37 L. J., Ch. (N. S.) 178, it was held that the plaintiff's rights to have his property protected from injury could not be enlarged by the fact

that in his manufactory he used a peculiar process of great delicacy.

In *Eastern and South African Telegraph Company v. Cape Town Tramways Companies,* L. R., A. C., (1902) 381, the court said:

" * * * If the apparatus of such concerns requires special protection against the operations of their neighbours, that must be found in legislation; the remedy at present invoked is an appeal to a common law principle which applies to much more usual and less special conditions. A man cannot increase the liabilities of his neighbour by applying his own property to special uses, whether for business or pleasure. * * *"

In *Kine v. Jolly,* L. R., 1 Ch. D. (1905) 480, the court said:

"I think we must bear in mind that in these cases, which are conveniently grouped together as cases in which the proper form of action is an action of nuisance, citizens are not to be allowed to enforce rights which limit the user by others of property, unless the facts relied upon as constituting a nuisance are such as interfere with the ordinary rights which according to the ordinary notions of mankind they are entitled to exercise in relation to one another and in relation to their property."

See also *Robinson v. Kilvert,* 41 Ch. D. 88, and *Hoare & Co. v. McAlpine,* 1 L. R., Ch. D. (1923) 167.

■ The plaintiff is not the owner of the real property on which its outdoor theater is located. Its only right in the property which has any bearing on this case is the right to operate a moving picture theater thereon. We adopt the following rule as stated in Restatement of Torts, § 822, p. 229:

" * * * One having 'property rights and privileges' in land can maintain an action under the

rule here stated, only when the conduct of the actor interferes with the exercise of the particular rights and privileges which he owns. * * *''

It follows from the application of this rule that the plaintiff's only basis of complaint is the fact that it is attempting to show upon the screen moving pictures, and that the operation is such a delicate one that it has been necessary for the plaintiff to build high fences to prevent the light of automobiles upon the public highway from invading the property and to build a shadow box over the screen to protect it from the ordinary light of moon and stars, and that it now claims damage because the lights from the defendant's property, which it has not excluded by high fences, shine with the approximate intensity of full moonlight upon the screen and interfere thereby with the showing of the pictures. We think that this is a clear case coming within the doctrine of the English and American cases, and that a man cannot increase the liabilities of his neighbor by applying his own property to special and delicate uses, whether for business or pleasure.

Finding no case in this jurisdiction in which the casting of light upon the premises of another has been judged as a nuisance, we turn to the cases from other jurisdictions in which that question has been discussed. We call attention first to the fundamental distinction between cases involving light and those involving smoke, gas, noxious odors and the like. The fact that the plaintiff in this case loves darkness rather than light does not mean that light can be classed as a noxious or generally injurious instrumentality.

In *Shepler v. Kansas Milling Co.*, 128 Kan. 554, 278 P. 757, the plaintiff sued the defendant milling company for damages because it had erected a number of

grain tanks 60 feet high across the street from plaintiff's residence. He alleged that the tanks were painted white and reflected the afternoon sun on his front porch "to his great annoyance and discomfort, and that his house was thereby rendered unsalable and no longer fit for residential purposes whereby its value was reduced some $1800". The court quoted the ancient maxim, Sic utere tuo, but stated that it has its limitations.

"The law does not in every instance provide directly for compensation or financial redress for every damnum a man may sustain as a member of an organized community. In White v. Kinkaid, 149 N. C. 415, 419, 63 S. E. 109, 111, 23 L. R. A. ( N. S.) 1177, 1179, 128 Am. St. Rep. 663, Mr. Justice Hoke said:

'It is a principle well established, that where a person, corporation, or individual is doing a lawful thing in a lawful way, his conduct is not actionable, though it may result in damage to another; for, though the damage done is undoubted, no legal right of another is invaded, and hence it is said to be damnum absque injuria.' "

The court said further:

"Appellee cites various cases where the freedom of an owner to devote his property to a use of his own choosing has been judicially interfered with as a nuisance. Of course, there are many such cases, as where gases from a brick plant destroyed vegetation (Fogarty v. Pressed Brick Co., 50 Kan. 478, 31 P. 1052, 18 L. R. A. 756); where smoke, dust and cinders caused substantial injury to neighboring property (Phillips v. Brick Co., 72 Kan. 643, 82 P. 787, 2 L. R. A [N. S.] 92; and where poisonous fumes from an oil refinery passed over neighboring lands (Helms v. Eastern Kansas Oil Co., 102 Kan. 164, 169 P. 208, L. R. A. 1918C, 227). But there is

no substantial analogy between such cases and the action sought to be maintained in the instant case. Plaintiff has no cause of action against defendant, and judgment to that effect must be directed.''

The case was decided as a pure question of law on demurrer to plaintiff's complaint.

In *Village of Wadena v. Folkestad,* 194 Minn. 146, 260 N. W. 221, the plaintiff sued to abate an alleged nuisance maintained by the defendant. The defendant maintained upon his property a truck terminal, warehouse and depot. The building was in a semi-residential district. Plaintiff alleged that the operation of the property constituted a nuisance because of the noise involved and the flashing of truck headlights. The lower court was reversed and the decree was entered in favor of the defendant.

The following cases seem to support the proposition that light cast upon plaintiffs' premises may, under some circumstances, constitute a nuisance, or contribute with other factors to the creation thereof: *Greene v. Spinning,* Mo. App., 48 S. W. (2d) 51; *Kellogg v. Mertens,* supra; *Nugent v. Melville Shoe Corporation,* 280 Mass. 469, 182 N. E. 825; *Hansen v. Independent School Dist. No. 1,* 61 Ida. 109, 98 P. (2d) 959; *Russell v. Nostrand Athletic Club,* 212 App. Div. 543, 209 N. Y. Supp. 76; *National Refining Co. v. Batte,* supra. In *Greene v. Spinning,* supra, the plaintiff and his family had resided for many years in a house located in a residential district. The defendant constructed, and was operating his service station, grease rack and store on adjoining property within 50 feet of plaintiff's house. Gasoline from the defendant's pipe line leaked into and polluted plaintiff's well. The evidence indicated that plaintiff suffered annoyance

from cars stopping at the service station and from the noise of horns, the grinding of brakes, etc., incident thereto. Plaintiff also complained that the work done on the grease rack caused smoke and odors to invade his premises and that the lights from the cars shone into the plaintiff's house and sleeping quarters, destroying sleep and privacy. It also appeared that the defendant caused gasoline explosions on his property. Relying on *National Refining Co. v. Batte,* supra, the court held that the light of cars shining into plaintiff's home constituted a nuisance. The defendant had indicated a willingness to erect a screen to shut off the rays of light from plaintiff's property. Thereupon an injunction was issued requiring the plaintiff to establish the screen, restraining the defendant from causing explosions on his property and requiring the removal of the grease rack from its then location. The court rejected the doctrine of *Rylands v. Fletcher,* L. R. 3 H. L. 330, and held that the leakage of gasoline was not actionable. The defendant was permitted to continue operations, subject to the limited provisions of the injunction.

In *Kellogg v. Mertens,* supra, the court enjoined the defendants from conducting rodeos in a residential and farming community. The nuisance consisted in excessive traffic, the quartering of livestock, dust, noise, unsanitary conditions, trespass by the public on plaintiffs' land and the use of flood lights. The court said:

> " * * * it was further clearly established that these several grounds of complaint were not mere inconveniences but were positive and existing nuisances which would unquestionably offend the sensibilities of any ordinary person, and which would without question seriously interfere with the rea-

sonable and proper use and enjoyment of plaintiffs' premises."

In *Nugent v. Melville Shoe Corporation,* 280 Mass. 469, 182 N. E. 825, the plaintiffs were owners of a dwelling house which immediately adjoined the property of the defendants. The acts complained of occurred in the construction of a building on the defendants' property within 4 feet of plaintiffs' house. The defendants, during the course of construction, maintained windows about 10 feet high and 6 feet wide with steel casings within a few feet of plaintiffs' bedrooms; the opening and closing of the windows caused a loud, slamming noise and the windows were frequently slammed about one o'clock in the morning. It further appeared that the defendants' windows, when fully opened, actually extended on plaintiffs' land a distance of 6 to 8 inches. In the course of construction the defendants also maintained a row of nitrogen lights in their buildings on the side opposite plaintiffs' bedrooms, which lights were turned on about midnight, and which disturbed the sleep of the plaintiffs. Other items of damage were the destruction of trees and shrubbery and the splattering of cement on plaintiffs' property. A decree was affirmed enjoining the nitrogen lights and the injury to trees and shrubbery, and awarding damages to the plaintiffs. This case also was one in which the interference was with the normal and ordinary use of the plaintiffs' property by persons of ordinary sensibilities.

In *Russell v. Nostrand Athletic Club,* supra, the court enjoined the operation of a boxing arena seating 20,000 persons, and located in a residential district. The elements constituting the nuisance were crowds, shouting through megaphones, tooting of horns, smoke

and gasoline fumes, ringing of trolley bells, and brilliant lights outside of, and in the arena. It appeared that the lights were frequently flashing on and off.

A case which somewhat resembles the one at bar is *Hansen v. Independent School Dist.*, supra. In that case, upon school district property which was located in a residential district, an athletic field was equipped and lighted and made ready for night baseball. The plaintiffs were the owners of property immediately adjacent to the ball park, and brought suit for an injunction alleging that the maintenance of the ball park in a residential district constituted a nuisance. The specific charges were that the games were played at night, that large crowds of noisy people attended, that the games continued on some occasions until one o'clock in the morning and that the plaintiffs were unable to rest because of noise, dust and beacon lights which lighted up the surrounding area, that automobiles were parked in such manner as to interfere with ingress and egress to appellants' property, and that baseballs were batted into the yards of the plaintiffs and that persons trespassed thereon for the purpose of recovering the balls and have thereby caused damage to the plaintiffs' property. In the first opinion of the court it was held that the flooding of plaintiffs' homes with excessive light, preventing sleep and rest, creation of excessive noise, trespass of balls and people and parking of automobiles resulted in the creation of a nuisance. The judgment of the trial court for the defendant was reversed. A strong dissent was filed by Budge, J. A rehearing was granted. The second opinion acknowledges that night baseball is a wholesome sport, entertaining many who could not enjoy the same in daytime. The court adhered to its former

decision to the extent of saying that "in the pursuit of this entertainment and pleasure, its devotees have no right to trespass upon the premises or disturb the ordinary use and enjoyment of the homes of law-abiding, industrious citizens". The case was sent back to the trial court for additional evidence upon the single issue as to the reasonable hour at which the games should close in order to properly protect the rights of the plaintiffs. The case was again before the Supreme Court upon plaintiffs' appeal from the decree of the lower court which was issued pursuant to the mandate of the Supreme Court on rehearing. The final injunction which was approved by the Supreme Court merely enjoined the defendants from allowing games to be played, noise incident to said games to exist, and lights used in connection with the games to shine on plaintiffs' premises so as to interfere with their sleep and with the reasonable and necessary enjoyment of their property *after the hour of 10:45 P. M.* The injunction also restrained defendants from allowing baseballs to be batted on the plaintiffs' premises. The final decree appears to have reduced the entire case to a tempest in a teapot.

In *National Refining Co. v. Batte,* supra, the plaintiff brought suit for injunction alleging that the operation by defendant of a filling station was a nuisance. The plaintiff's private residence was directly opposite the point at which two streets intersected at a sharp angle. The triangular tract of land immediately across the avenue from the plaintiff's house was operated as a filling station. It was alleged that the erection of the station has caused the continuous presence of autos with attendant noise, confusion and annoyances, and that the headlights of the automobiles which entered

the filling station shown directly upon plaintiff's property "to the extent that he is unable to sit or rest upon the front porch of his house with any comfort or pleasure", and that lights also penetrated the interior of the house, rendering it difficult to sleep or maintain privacy therein. The court held that:

> " * * * if the statements of the bill are true, it would be impossible to sit upon complainant's front porch, and use the porch as a place of rest or pleasure, while such lights were being constantly thrown directly thereon. * * *"

It was held that the demurrer to the complaint was properly overruled. This case arose in Jackson, Mississippi in the year 1924. We doubt if the case would be followed in any state under conditions prevailing at the present time.

The only case which has been brought to our attention, and in which it has been held that light unaccompanied by any other element of an offensive character constitutes a nuisance, is the case of *The Shelburne, Inc. v. Crossan Corporation,* supra. The plaintiff was the owner of a large hotel on the board walk in Atlantic City which had been operated in the same location for many years. Sixty of its bedrooms had a southerly or southwesterly exposure. The defendant corporation was the owner of property immediately to the southwest, upon which was erected an apartment house. On the roof of the apartment house defendants had erected a sign 66 feet in height and 72 feet in length on which there were 1084 15-watt lights and 6 100-watt lights and 28 75-watt lights. The sign was parallel to the wing of the hotel and about 110 feet distant therefrom. The evidence disclosed that the sign "lights up 40 or 45 rooms in the new wing of the hotel", disturbs the guests

and lowers the value of the rooms. The court held that light "may become a nuisance if it materially interferes with the ordinary comfort physically of human existence". The trial judge held that the complainant was entitled to a decree restricting the operation of the electric lights during each night *after the hour of 12 o'clock midnight.* The plaintiff's hotel was located on the famous board walk at Atlantic City, where the primary activity appears to be the entertainment of luxury-loving people. We suspect that the court was moved by a comparison of the utility of plaintiff's hotel in that district with the utility of an advertising sign. In any event, the interference was with the normal and ordinary sensibilities of dwellers in the hotel, and with the ordinary use of property.

All of the cases in this group, with the exception of *Shelburne v. Crossan,* may be distinguished in two respects: In each case the shedding of light upon plaintiffs' property was only one, and a minor element among many, which, together, were held to constitute nuisance. In all of the cases, including the Shelburne case, the harm complained of related to the normal and ordinary use of residential property.

By way of summary, we have found no case in which it has been held that light alone constitutes a nuisance merely because it damaged one who was abnormally sensitive or whose use of his land was of a peculiarly delicate and sensitive character.

■ It is not our intention to decide the case upon authority alone, divorced from reason or public policy. The photographic evidence discloses that the properties of the respective parties are not in a residential district, and in fact are outside the city limits of Portland, and lie adjacent to a considerable amount of

unimproved land. Neither party can claim any greater social utility than the other. Both were in process of construction at the same time, and the case should not be decided upon the basis of the priority of occupation. The case differs fundamentally from other cases, all typical cases of nuisance, in that light is not a noxious, but is, in general, a highly beneficial element. The development of parks and playgrounds equipped for the enjoyment of the working public, whose recreation is necessarily taken after working hours, and frequently after dark, is a significant phenomenon in thousands of urban communities. The court takes judicial knowledge that many lighted parks and fields are located adjacent to residential property and must to some extent interfere with the full enjoyment of darkness (if desired) by the residents.

We do not say that the shedding of light upon another's property may never under any conditions become a nuisance, but we do say that extreme caution must be employed in applying any such legal theory. The conditions of modern city life impose upon the city dweller and his property many burdens more severe than that of light reflected upon him or it.

In this case, the court directed a verdict for the defendant. We recognize the general rule to be that the existence or nonexistence of a private nuisance is ordinarily a question of fact for the jury, but the rule is subject to exceptions. In its discussion of the law of private nuisance we find the following from the Restatement of Torts:

"* * * In respect to certain types of intentional invasion, however, there has been a crystallization of legal opinion as to gravity and utility, with the result that such invasions are held to be reason-

able or unreasonable as a matter of law. This crystallization may appear in the form of a legislative enactment, or it may be the result of a series of judicial decisions. * * *'' Restatement of the Law of Torts, Vol. 4, § 826, comment d.

See also *Shepler v. Kansas Milling Co.,* supra, and *McCarty v. Natural Carbonic Gas Co.,* 189 N. Y. 40, 81 N. E. 549, where it is said that, ''What is reasonable is sometimes a question of law and at others a question of fact''. We limit our decision to the specific facts of this case and hold as a matter of law that the loss sustained by the plaintiff by the spilled light which has been reflected onto the highly sensitized moving picture screen from the defendant's property 832 feet distant, and which light in intensity is approximately that of a full moon, is damnum abseque injuria.

The trial court did not err in directing a verdict. The judgment is affirmed.