Argued March 3, affirmed April 13, 1960

# GRONN ET UX *v.* ROGERS CONSTRUC-
# TION, INC.

## 350 P. 2d 1086

*W. W. McKinney* and *T. W. Churchill*, Salem, argued the cause and submitted a brief for appellants.

*David O. Bennett, St. Helens*, argued the cause for respondent. With him on the brief was John M. Coke, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, O'CONNELL and HOLMAN, Justices.

O'CONNELL, J.

The plaintiffs bring this action to recover damages to their mink herd alleged to have been caused by vibrations, concussion and noise resulting from the defendant's operations in connection with the construction of a road. Plaintiffs appeal from a judgment of involuntary nonsuit.

Plaintiffs own and operate a mink ranch near Clatskanie, Oregon. Defendant, under a contract with the State Highway Department, was engaged in highway construction work near plaintiffs' ranch. In connection with this work defendant engaged in blasting operations at a quarry located approximately one-third of a mile from plaintiffs' ranch. The defendant operated rock-crushing equipment at the quarry site and the rock was then hauled by large mobile conveyors to the road under construction. Plaintiffs allege that the discharge of the explosives at the quarry and the noise and vibration from the rock-crushing equipment and trucks frightened and excited the mink as a result of which a large number of the mink kittens were stillborn

or stunted in growth, and some of the adult mink were rendered less valuable because they became useless for breeding stock and because of the reduction in the quality of the pelts.

It was shown that the nature of the mink is such that loud and unusual noises or concussions at the time of whelping are likely to cause the female mink to produce stillborn kittens and to neglect or abandon those kittens which are born alive.

Plaintiffs allege two causes of action: the first based upon the theory of strict liability; the second on the theory of nuisance. To make out the first cause of action it is alleged that defendant was engaged in an ultrahazardous activity in the quarrying operation, and that notwithstanding the fact that it knew or should have known of the close proximity of plaintiffs' mink ranch and of the above described propensities of mink, it nevertheless, set off numerous charges of explosives causing the alleged damage.

In the second cause of action, based upon the theory of nuisance, it is alleged that the discharge of explosives, the operation of the rock-crushing equipment and hauling operations caused noises and concussions of great violence and frequency which resulted in the alleged damage.

We shall consider first the applicability of the doctrine of strict liability of the facts of the present case.

The case of *Bedell v. Goulter*, 199 Or 344, 261 P2d 842 (1953) established the rule in this state that one who discharges explosives may, under the proper circumstances, be strictly liable for the consequent injury, even though the injury is brought about solely through vibration or concussion. But that case did not purport to establish a rule making the blaster absolutely liable

for all damages resulting from a blasting operation. The court had before it the question of the blaster's liability to the owner of a structure which was damaged by the blast. The case at bar presents quite a different question. Plaintiffs do not seek recovery for damages which might have been caused to buildings on their land, nor do they complain that the noise and vibration caused them personal discomfort in the use and enjoyment of their land; and they do not claim that any of their mink were killed or harmed directly by the force of the explosion. Their sole claim rests upon the damage which it is alleged resulted to their mink because of the peculiar susceptibility of mink to noise and vibration. Is this the type of risk of harm which characterizes defendant's conduct as extra hazardous? Clearly not. Defendant's conduct is classified as ultrahazardous because of the potential physical damage resulting from the force of an explosion, not because of the "psychological" effect it may have on either human beings or animals. As stated in Prosser on Torts (2d ed), p 338, "In general, strict liability has been confined to those consequences which lie within the extraordinary risk created, both as to the type of harm threatened and the persons within the area of danger." To the same effect see Harper, Liability Without Fault and Proximate Cause, 30 Mich L Rev 1001, 1006 (1932):

"* * * But one who engages in extra-hazardous conduct is liable only for those consequences which belong to the general class of harms threatened by his conduct. Thus, though the defendant keeps a wild animal that is vicious by nature, he is not liable for injuries produced by a horse becoming frightened and running away at the sight of the animal on the road. Such a harm is not one of the general classes of harms which make his conduct extra-hazardous."

This limitation on the defendant's liability has been applied in a case similar to the case at bar. In *Madsen v. East Jordan Irr. Co.*, 101 Utah 552, 125 P2d 794 (1942) plaintiff, the owner and operator of a mink farm sought recovery against the defendant for damage resulting to plaintiff's mink from defendant's blasting operation. It was alleged that the explosion caused vibrations and noises which frightened the mother mink and caused some of them to kill their kittens. In holding that the lower court properly sustained a demurrer to the complaint, the court said:

> "* * * Whether the cases are concussion or nonconcussion, the results chargeable to the non-negligent user of explosives are those things ordinarily resulting from an explosion. Shock, air vibrations, thrown missiles are all illustrative of the anticipated results of explosives; they are physical as distinguished from mental in character. * * * In the instant case, the killing of their kittens was not an act of self-preservation on the part of the mother mink but a peculiarity of disposition which was not within the realm of matters to be anticipated." 125 P2d at page 795.

We hold that the defendant's conduct does not impose upon it strict liability for the harm which is recited in plaintiffs' complaint as a basis for recovery.

We next consider the second cause of action based upon the law of nuisance. We are taught that an invasion of one's interest in the use and enjoyment of land (private nuisance) may result from conduct which is either intentional or unintentional; intentional if the defendant acts for the purpose of causing the invasion or if he knows that it is resulting or is substantially certain to result from his conduct; unintentional if he acts negligently, recklessly or ultrahazardously. We have already concluded that the

defendant's conduct was not ultrahazardous with respect to the harm of which plaintiffs complain. The limitation upon strict liability described above is equally applicable to the law of nuisance. Harper, op. cit. supra at page 1006. And there is no evidence that defendant's conduct was reckless. Restatement of the Law of Torts, §§ 500, 822. The question is, therefore, narrowed to the inquiry as to whether there is an intentional or negligent invasion of plaintiffs' interest in the use and enjoyment of their land.

The defendant relies upon the principle stated in *Amphitheaters, Inc. v. Portland Meadows*, 184 Or 336, 198 P2d 847, 5 ALR2d 690 (1948) that a landowner "cannot increase the liabilities of his neighbor by applying his own property to special and delicate uses, whether for business or pleasure." 184 Or at page 353. *Bradbury Marble Co. v. Laclede Gas Light Co.*, 128 Mo App 96, 106 SW 594 (1908); *Eastern and South African Telegraph Company v. Cape Town Tramways Companies*, [1902] L.R., A.C. 381; *Kine v. Jolly*, [1905] L.R., 1 Ch. D. 480; *Noyes v. Huron & Erie Mortgage Corp.*, [1932] 3 D.L.R. 143. See: Salmond on Torts (11th ed), pp. 252-260; Comment, 62 Harv L Rev 704 (1949); Comment, 3 Miami L Q 316 (1949).

■■■ In weighing the conflicting interests of persons using land it is certainly appropriate to take into consideration the fact that the plaintiff's use is sensitive in character. But a sensitive use is entitled to protection if the conduct of the defendant is unreasonable with respect to that sensitive use. It seems obvious, therefore, that the principle stated in terms of sensitivity of use is nothing more than an emphasis upon one aspect of the general weighing process which must be employed to determine where the balance of interests

lies. An invasion of plaintiff's interest is unreasonable "unless the utility of the actor's conduct outweighs the gravity of the harm" 4 Restatement, Torts, § 826, p. 241. 1 Harper & James, The Law of Torts, § 1.24; Prosser on Torts (2d ed), pp 410-416. See, Prosser, Nuisance Without Fault, 20 Texas L Rev 399 (1942). Some of the specific factors considered in determining the interests of the parties are the extent and character of harm involved; the social value of the respective uses; the suitability of each use to the character of the locality in which it is conducted; the ability of the defendant or plaintiff to prevent or avoid the harm. *York v. Stallings,* 217 Or 13, 341 P2d 529 (1959); *Amphitheaters, Inc. v. Portland Meadows,* supra; *Kramer v. Sweet,* 179 Or 324, 169 P2d 892 (1946); *Stoddard v. Snodgrass,* 117 Or 262, 241 P 73, 43 ALR 1160 (1926); 4 Restatement, Torts, §§ 828, 829. See: Prosser on Torts (2d ed), pp 410-416.

■ Both plaintiffs and defendant were engaged in legitimate uses of property. According to the accepted standards of our society defendant's conduct in constructing a public highway would, undoubtedly, be deemed of greater social value than plaintiffs' operation of a mink farm. However, this fact would not give the defendant a license to carry on its project without regard to the character of plaintiffs' business. This is illustrated in two fairly recent cases involving damage to mink as a result of blasting operations by the defendant. In *MacGibbon v. Robinson,* [1953] 2 D.L.R. 689 the defendant, in clearing his land, blasted out tree trunks with dynamite. He knew that plaintiffs were operating a mink farm near-by, and he also knew of the propensity of mink, if disturbed by loud noises, to harm their kittens. As a result of defendant's blasting

operations plaintiffs' mink were harmed. In holding that the defendant was liable the court said:

"The evidence shows that there was no occasion for him to fire the shots during the whelping season. There is no doubt that in the ordinary circumstances existing in the district in which the parties lived, the blasting of stumps was a reasonable use of his land. There is no doubt also that the plaintiffs could not, by engaging in some particular trade on adjoining property, prevent the defendant from using his land reasonably: see *Robinson* v. *Kilvert* (1889), 41 Ch.D. 88; and *Eastern & South African Telegraph Co.* v. *Cape Town Tramways Companies Ltd.*, [1902] A.C. 381. The plaintiffs could not object to the defendant clearing his land by blasting at all times during the year, but in my opinion this does not dispose of this case. The whelping season would only last a month. There was not the slightest necessity for blasting the two stumps in question at the time he did. It was only at this special period that the blasting would injure the plaintiffs' mink." 2 D.L.R. at 691, 692.

Here it will be observed the factor of the defendant's ability to avoid the harm tipped the scale in favor of the plaintiffs. Very possibly the court may have considered the economic importance of the mink industry in Canada, but that factor was not expressly relied upon in the opinion.

Another Canadian case with facts very similar to those of the present case is *Mason v. Grandel*, [1952] 1 D.L.R. 516. There the defendants were employed by the Department of Highways of the province of Saskatchewan to construct a road near plaintiff's mink farm. The work was done with noisy machinery during the whelping period as a result of which some of the females ate their young. Plaintiff had warned the defendants not to continue their operations and the

engineer for the highway department instructed the resident engineer to cease construction on the road in front of plaintiff's farm, but through the error of defendants' workmen the instruction was not followed and the work was carried on close to the plaintiff's mink sheds. The court held that the defendants were negligent in carrying on their operations with knowledge that the plaintiff's mink would be endangered. Here again the evidence established that it was practicable for the defendants to postpone their operations near plaintiff's farm during the whelping period. In other words, the defendants could have avoided the harm.

Considering the case at bar in light of the foregoing cases, particularly with reference to the question of defendant's fault in proceeding with his operations in face of the knowledge of its effect on plaintiffs' mink, we find substantially different circumstances. These circumstances were as follows. Plaintiff, H. E. Gronn, testified that the breeding season for his mink started in March and that in the year 1955, when the alleged damage occurred, he had commenced the breeding operation on March 19, and completed it on March 29. The first litters were whelped on May 4, 1955. The normal whelping season ran from the first part of May to May 20 or not later than May 25. Gronn first heard the noise from defendant's blasting in March. On March 15 he went to the resident engineer of the State Highway Department and made inquiry concerning the blasting operations. He was informed that the dynamiting would continue throughout the summer and that within a week or ten days a large charge would be set off. When Gronn asked if the large explosion could be delayed it was suggested that he see the foreman in charge of the blasting job. Gronn went to the quarry

and asked the foreman when the charge would be set off. He was told that it would be "some time in the next week," approximately March 25. Gronn's testimony then continues as follows:

"A. * * * So I asked him; I said, there is no chance of you fellows postponing it until the first of April. He said, well I am only doing a job; he couldn't postpone it if he wanted to, he said, and he said, we have a time limit in the contract, he says, and there is just no chance, he says; I am going ahead with the digging and when it is loaded, he said, I am going to shoot it.

"Q. Do you know what his name was?
"A. No, I don't.

"Q. Did you tell him why you wanted it delayed?
"A. Yes, we discussed mink to quite an extent that day because he seemed to be very interested; very nice gentleman, and we talked a lot more than my complaint would have consisted of because due to the cooperative nature of him and his other men there with him, we went into the mink game to quite an extent.

"Q. You told him it was in regard to your whelping season you wanted that continued?
"A. No. I told him it was due to the fact I was in the act of breeding and I told him I would have to complete my breeding season by April 1st and I wanted to have the big charge delayed until after the breeding season so as to not cause undue trouble. He told me he couldn't postpone it. He says he will do this. He says, 'I will call on you before I set the charge off.' He said, 'I will notify you.'
* * * * *

"Q. Did you make any more inquiries about this blast and this work after that? After talking to him?
"A. I didn't talk to him again. Time rode along after that; I was expecting notification of the big

blast but it didn't, through the month of March it didn't come but then on the first or second day of April, they came to the house and notified me the blast would be discharged in a short time.

"Q. Where were you when they notified you?

"A. Well, when they notified us, I was in the yard and as soon as he had gone back on the road again, I went back to the mink yard and proceeded to go about my work.

"Q. What did he tell you when he came to you?

"A. He just tole me he was here to notify me they were going to set the big blast in just a short time."

On cross-examination Gronn testified as follows:

"Q. Then at that time you were asking him [the foreman at the quarry] to delay the blasting until after April 1st?

"A. I asked him in regard to stopping it—

"COURT: Answer the question.

"A. Yes, yes.

"Q. You did?

"A. Yes.

"Q. Isn't it a fact, Mr. Gronn, that the blasts took place after April 1st. You testified it was April 3rd and they would notify you—

"A. They notified me, yes.

"COURT: Did it take place on April 3rd?

"A. I can't be positive as to the date. It was one of the first days in April.

"Q. It was after April 1st.

"A. On or after, yes.

"Q. Did you ever complain again subsequent to that time to anybody connected with Rogers Construction Company about the blast during the year 1955?

"A. No."

■ The substance of this testimony is that Gronn requested a delay in setting off the charge until after April 1st and the defendant complied with the request. When plaintiff was notified that the charge would be set off there was no request for further delay. Under those circumstances the defendant would be justified in assuming that it could proceed to set off the charge without objection and without danger to the plaintiffs' operation. There is no evidence of any further warning by plaintiffs, either with respect to the first blast or any subsequent blasts. There is no evidence that any other blasts caused damage to the plaintiffs' mink. Under these circumstances the defendant cannot be charged with either negligence or intentional conduct to make out a case of nuisance.

■ The plaintiffs further attempted to prove that noise from the rock-crushing operation and from the vehicles which hauled the rock away was a part of the cause of the damage to the mink. The evidence relating to the noise caused by the mobile conveyors was unsubstantial. Gronn admitted that all kinds of vehicles passed along the same highway which was used by the defendant. Those vehicles included large freight trucks, transports, and large logging trucks. Plaintiff testified that defendant's vehicles created a greater noise than the other large vehicles which moved along the highway in front of his ranch. Granting that this was true, we are of the opinion that plaintiffs have no right to preclude the defendant from the normal use of the highway by mobile conveyors simply because plaintiffs' mink operation would be adversely affected. We can say as a matter of law that the utility of defendant's conduct outweighs the gravity of plaintiffs' harm.

In the present case defendant was not notified by plaintiffs with respect to the noise from the trucks

until the latter part of June or the first part of August, which latter date was not more than two weeks before defendant completed the job and left. It was not shown that before this notice defendant knew that the noise from its vehicles affected plaintiffs' mink in any way. As a matter of fact there is no proof that such noise had any effect on the mink either before or after this so-called notice. Under these circumstances there is not sufficient evidence to show a causal connection between the alleged noise and the injury to plaintiffs' mink.

The record contains no evidence that the plaintiff notified defendant or that defendant had knowledge that the rock-crushing equipment affected plaintiffs' mink. We do not propose to decide whether, having notice, the continuation of the rock-crushing operation could result in a nuisance, but certainly if defendant has no knowledge that an otherwise harmless operation is causing harm he cannot be made liable.

The trial court correctly granted a nonsuit.

Judgment affirmed.