Argued and submitted September 7, 1988, the decision of the Court of Appeals affirmed, but on different grounds, the decision of the trial court reversed and remanded to the trial court for further proceedings May 9, 1989

# LLOYD CORPORATION, LTD.,
*Petitioner on Review,*

*v.*

# WHIFFEN et al,
*Respondents on Review.*

(CC A8512-08127; CA A38839; SC S35170)

773 P2d 1294

Milton C. Lankton and Duane A. Bosworth, of Ragen, Tremaine, Krieger, Schmeer & Neill, Portland, argued the cause and filed the petition for petitioner on review.

Gregory Kafoury, Portland, argued the cause and filed a response to the petition for respondent on review Eric Stachon.

No appearance for respondents on review Whiffen, Weitzman, and John Doe 1-100.

Charles F. Hinkle, of Stoel, Rives, Boley, Jones & Grey, Portland, filed a brief on behalf of *amicus curiae* Fred Meyer, Inc.

Edward J. Sack, New York, New York, and Gile R. Downes, of Schulte, Anderson, DeFrancq, Downes & Carter, P.C., Portland, filed a brief on behalf of *amicus curiae* International Council of Shopping Centers, Inc.

Mark A. Anderson, of Miller, Nash, Wiener, Hager & Carlsen, and Henry Kantor, Portland, filed a brief on behalf of *amicus curiae* The ACLU Foundation of Oregon.

James S. Coon, of Imperati, Barnett, Sherwood & Coon, P.C., Portland, filed a brief on behalf of *amicus curiae* National Lawyers' Guild.

Before Peterson, Chief Justice, Linde, Campbell,** Carson, Jones and Gillette, Justices, and Van Hoomissen, Justice pro tempore.

JONES, J.

---

** Campbell, J., retired December 31, 1988.

## JONES, J.

The issue is whether the owner of a privately owned shopping center open to the public for commercial purposes may obtain a declaration of rights and an injunction against persons entering the shopping center to obtain petition signatures; or whether the defendant-solicitors have a right to solicit petition signatures in the shopping mall without plaintiff's permission.

The circuit court ordered that "defendants are hereby restrained and enjoined from entering upon plaintiff's private property to exercise their expressions of opinion or to gather signatures in the initiative and referendum process without plaintiff's permission or consent." The Court of Appeals reversed, holding that the order violated defendants' rights of expression under Article I, section 8, of the Oregon Constitution, and that defendants could exercise their free expression rights in the shopping center subject to reasonable time, place, and manner regulations. *Lloyd Corporation v. Whiffen,* 89 Or App 629, 750 P2d 1157 (1988). We affirm the decision of the Court of Appeals, but on different grounds.

### FACTS

Most of the facts are undisputed.[1] Lloyd Center (Center) is a retail shopping center located in Portland. Plaintiff is the owner of fee title to the land the Center occupies. Five public streets cross the Center and at least six other public streets run partly into and around the Center. In total, there are more than 66 blocks of publicly owned sidewalks in the Center. There is also an adjacent public park. The privately owned areas of the Center contain stores, professional and business offices, covered walkways, and open and covered areas for automobile parking. At least nine stores open directly onto or within a few feet of public streets. There are public bus stops on public streets adjacent to the public sidewalks in the Center. All entrances to and exits from the Center cross public sidewalks.

The privately owned mall and walkways are designed,

---

[1] The parties agreed that the transcript of the injunction hearing, together with an agreed statement of facts and the pleadings, would be the record on the request for a final injunction. *See* ORCP 79C(2).

decorated, and managed to promote retail business, to please plaintiff's tenants and their customers, clients, and patients, and to encourage prospective customers to come to the Center where they may view and buy merchandise or partake of services. Gardens, flower beds, statuary, murals, various other works of art, benches, elevators and escalators, stairways and bridges, and directories and information booths adorn the private mall and walkways. Recorded music is broadcast in the ice rink and throughout the Center as part of the desired atmosphere. Plaintiff and plaintiff's tenants pay the entire cost of maintaining the privately owned common areas in the Center, which exceeds $1 million per year. All this is intended to create a pleasant environment conducive to purchasing merchandise or services.

Since the inception of its business in 1960, plaintiff without discrimination has attempted to prohibit solicitation or distribution of political leaflets or petitioning in the privately owned mall and walkways of the Center. Neither tenants of the Center nor nontenants are permitted to engage in any such activity. At each of 25 entrances to the private areas, plaintiff has embedded signs in the walkways stating:

"NOTICE — Areas in the Lloyd Center used by the public are not public ways but are for the use of Lloyd Center tenants and the public transacting business with them. Permission to use said areas may be revoked at any time. Lloyd Corporation, Ltd."

The record supports plaintiff's contention that it attempts to limit access of persons whose purpose is not to shop or "do business with" plaintiff or its tenants. It is obvious, however, that plaintiff would not exclude a person who comes only to meet an employee or a shopper at the Center or persons who simply walk through the mall for exercise. Plaintiff's signs tell the public that the open areas of the Center (1) are not public ways, (2) are for the use of the Center's tenants and the public transacting business with them, and (3) that plaintiff may revoke permission to use the areas at any time. They do not purport to deny entry to casual visitors. They do not imply that someone crossing from one street to another through the Center's public area is a trespasser. But one thing is clear: plaintiff makes no open-ended invitation to the public to use the Center as a forum to debate public issues.

In December 1985, defendants entered the Center to

gather signatures on three initiative petitions. The parties agreed that "[e]mployees of the plaintiff have requested defendants and others who seek to gather initiative petition signatures to cease their activities on the privately owned portions of Lloyd Center and have asked those persons to go to public sidewalks or other public areas to obtain signatures." After this request, defendants continued their activity and declared that they would continue to do so unless arrested or enjoined. Accordingly, plaintiff commenced this litigation for an injunction and for a declaratory judgment.

## ANALYSIS

### I.

From the beginning, the parties have treated this as a constitutional case. Plaintiff claimed that a refusal to enjoin defendants' activity would constitute a taking of its property. Defendants counterclaimed for a declaration that they have a "right" under the Oregon Constitution to gather initiative petition signatures in the Center.[2] Judicial opinions elsewhere take up the constitutional debate, displaying deep divisions about the correct analysis.[3] We will not join in that debate,

---

[2] Defendants assert that the injunction issued by the circuit court violated their rights under the Oregon Constitution. Specifically, defendants maintain that they have a right to solicit signatures in the Center under the free expression and assembly provisions of Article I, sections 8 and 26. Article I, section 8, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

Article I, section 26, provides:

"No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of greviances [sic]."

Defendants filed counterclaims in which they asked the court to enjoin plaintiff from attempting to eject them from the privately owned portions of the Center and to declare that defendants have a right under the Oregon Constitution to gather initiative petition signatures there.

[3] Most of the cases are decided on differing constitutional grounds and are not helpful to our analysis in disposing of this case on a nonconstitutional basis. At last count, seven cases favored the shopping malls: *Fiesta Mall Venture, et al. v. Mecham Recall Committee,* 2 CA-CV 88-0195 (Ariz Ct App Oct. 31, 1988); *Cologne v. West Farms Associates,* 192 Conn 48, 469 A2d 1201 (1984); *Woodland v. Michigan Citizens Lobby,* 423 Mich 188, 378 NW2d 337 (1985); *Shad Alliance v. Smith Haven Mall,* 66 NY2d 496, 488 NE2d 1211, 498 NYS2d 99 (1985); *State v. Felmet,* 302 NC 173, 273 SE2d 708 (1981); *Western Pennsylvania Socialist Workers 1982 Campaign v. Con-*

however, without first examining the parties' rights on a subconstitutional level. Our practice is to refrain from constitutional holdings unless ordinary legal principles cannot resolve the dispute. *State v. Edgmand,* 306 Or 535, 538-39, 761 P2d 505 (1988); *Planned Parenthood Assn. v. Dept. of Human Res.,* 297 Or 562, 564, 687 P2d 785 (1984).[4]

A court applying a common-law rule or fashioning an equitable order must observe constitutional principles as much as a legislative or administrative body. *See Hall v. The May Dept. Stores,* 292 Or 131, 145-46, 637 P2d 126 (1981); *Wheeler v. Green,* 286 Or 99, 117-19, 593 P2d 777 (1979); *Crouch v. Central Labor Council,* 134 Or 612, 622, 293 P 729 (1930). Although court involvement may trigger constitutional analysis, it does not prove a constitutional violation. Thus, in deciding this case we will discuss constitutional provisions and interpretations without necessarily deciding any constitutional right or violation. Whether a judicial decision of a private claim invades constitutional rights depends on whether the remedy fashioned by the court invades constitutional rights. The same judicial remedy — for instance, an injunction — may be permissible in one case but not in another. In this case, we conclude on a subconstitutional level that plaintiff is not entitled to the broad injunction it sought and received.

## II.

Plaintiff seeks an injunction against defendants for unreasonably interfering with plaintiff's use of its property. Plaintiff has established that defendants are on plaintiff's property without permission; indeed, defendants are transgressing a direct prohibition. Plaintiff's success in making this

---

*necticut General Life Ins. Co.,* 512 Pa 23, 515 A2d 1331 (1986); *Jacobs v. Major,* 139 Wis 2d 493, 407 NW2d 832 (1987), and three cases favored the public's use for activities the same or similar to defendants' in this case: *Robins v. Pruneyard Shopping Center,* 23 Cal 3d 899, 592 P2d 341, 153 Cal Rptr 854 (1979), *aff'd sub nom Pruneyard Shopping Center v. Robins,* 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980); *Batchelder v. Allied Stores International, Inc.,* 388 Mass 83, 445 NE2d 590 (1983); *Alderwood Assocs. v. Envtl. Council,* 96 Wash 2d 230, 635 P2d 108 (1981).

[4] Avoiding needless constitutional rulings is not a technical nicety of judicial etiquette. If there is no duty to decide the constitutionality of a law, there is a duty not to decide it. This rule prevents premature foreclosure of opportunities for legislators who are better equipped to consider and choose among different policies. *See Cologne v. Westfarms Associates,* 192 Conn 48, 469 A2d 1201, 1209-10 (1984).

demonstration does not, however, automatically prove its entitlement to the injunction granted by the trial court.

■      In a trespass case not involving the public interest, once a plaintiff establishes that his protected interest in exclusive possession of land will be repeatedly invaded, an injunction ordinarily issues against the continuing trespass to avoid the multiplicity of law suits otherwise necessary to vindicate the plaintiff's rights in damages.[5] But an injunction remains discretionary and subject to equitable considerations; it is not available as a matter of right.

This court has recognized that equitable remedies against invasions of real property do not follow inexorably when a landowner seeks to deny entry. In *Atkinson v. Bernard, Inc.,* 223 Or 624, 355 P2d 229 (1960), the trial court granted landowners an injunction against noisy low-level flights across their land from a small airport. The trial court applied the "privileged trespass" rule of the Restatement of Torts § 460 (1934), which this court had cited in another context: "Air travel over a plaintiff's land is still recognized as trespass prima facie imposing liability but the rights of airplane travel are established or recognized by the doctrine of privilege." *Amphitheaters, Inc. v. Portland Meadows,* 184 Or 336, 344, 198 P2d 847 (1948). In *Atkinson,* this court recharacterized what previously had been "trespass" as "nuisance" and then applied equitable balancing to fashion the injunctive decree:

> "We hold that whenever the aid of equity is sought to enjoin all or part of the operations of a private airport, including flights over the land of the plaintiff, the suit is for the abatement of a nuisance, and the law of nuisance rather than that of trespass applies." *Atkinson,* 223 Or at 633.

Similarly, in *York v. Stallings,* 217 Or 13, 341 P2d 529 (1959), the court characterized as a "nuisance" the invasion of landowners' property by a particulate fallout and noise from a sawmill. The court wrote: "Turning to the applicable rules of law, we first take note of the proposition that an injunction is

---

[5] *See Seufert Bros. Co. v. Hoptowit,* 193 Or 317, 328, 237 P2d 949, *cert den* 343 US 926 (1951); *Columbia Fishermen's Union v. St. Helens,* 160 Or 654, 664, 87 P2d 195 (1939); *Central Oregon Irr. Co. v. Whited,* 76 Or 255, 266, 142 P 779, 146 P 815 (1915); *Stotts v. Dichdel,* 70 Or 86, 91-93, 139 P 932 (1914); *Anderson v. Miami Lumber Co.,* 59 Or 149, 160, 116 P 1056 (1911); *Chapman v. Dean,* 58 Or 475, 479-80, 115 P 154 (1911).

an extraordinary remedy and will be granted only upon clear and convincing proof." 217 Or at 19. Although the plaintiffs were entitled to some relief,

> "it does not follow that an injunction should issue as a matter of course. The court may refuse an injunction in certain cases where the hardship caused to the defendant by the injunction would greatly outweigh the benefit resulting to the plaintiff. The injunction does not issue as a matter of absolute or unqualified right but is subject to the sound discretion of the court. * * *" 217 Or at 22.

The court quoted and approved the rule stated in Restatement of Torts § 941:

> " 'The relative hardship likely to result to the defendant if the injunction is granted and to the plaintiff if it is denied, is one of the factors to be considered in determining the appropriateness of an injunction against tort.' " 217 Or at 23.

The opinion continued:

> "This court heretofore has accepted the balancing doctrine in cases involving the public inconvenience. In *Fraser v. City of Portland,* 81 Or 92, 98, 158 P 514 [1916], this court stated:
>
> > " '* * * sometimes a court of equity will decline to raise its restraining arm and refuse to issue an injunction * * * even though an admitted legal right has been violated, when it appears that * * * the issuance of an injunction would cause serious public inconvenience or loss without a correspondingly great advantage to the complainant.' " 217 Or at 24.

The *York* court limited the decree to "unreasonable interference" with the plaintiffs' enjoyment of their property and remanded the case to the circuit court to take further evidence on the fallout issue.

When damages only were at stake, however, the court has allowed an "action of trespass" for what it earlier characterized as "nuisance" in deciding whether a landowner was entitled as a matter of right to enjoin the invading conduct. In *Martin v. Reynolds Metals Co.,* 221 Or 86, 342 P2d 790 (1959), *cert den* 362 US 918 (1960), landowners complained of fallout from an aluminum reduction plant, much like the fallout from the sawmill in *York v. Stallings, supra.* Unlike the Yorks,

however, the Martins sought damages, and the measure of damages would differ with the characterization.

The *Martin* court distinguished the two theories by whether the defendant's acts invaded the plaintiffs' interest in "the exclusive possession of land" (trespass), or their interest in "the use and enjoyment" of the land (nuisance), noting that the same conduct may invade both interests. 221 Or at 90. The court affirmed a judgment of damages for trespass. To do so, it had to distinguish *Amphitheaters, Inc. v. Portland Meadows, supra,* which had characterized light, smoke, noxious odors and the like as "nontrespassory invasions" and had sustained a directed verdict for defendants. The *Martin* court wrote:

> "The Amphitheaters case can be explained in terms of this latter point of view, i.e., that the glare of defendant's lights could be regarded as an intrusion within the law of trespass, but that the plaintiff had no right to treat the intrusion as actionable in view of the nature of plaintiff's use and the manner in which the defendant interfered with it. Had the defendant purposely, and not as an incidence of his own legitimate use, directed the rays of light against the plaintiff's screen the court might well have taken the position that the plaintiff could have recovered in a trespass action. These illustrations demonstrate that the tort of trespass involves a weighing process, similar to that involved in the law of nuisance, although to a more limited extent than in nuisance and for a different purpose, i.e., in the one case to define the possessor's interest in exclusive possession, and in the other to define the possessor's interest in use and enjoyment." 221 Or at 96.

In short, the cases show that invasions of another's real property are not always enjoined, even when the invasion qualifies as "trespass" for purposes of liability for damages. The cases can be distinguished insofar as the harmful invasion takes a form other than the entry of human beings on the owner's land, but that is a distinction without a real difference. The unwanted light shining upon the screen of an outdoor movie theater in *Amphitheaters, Inc.* or the noxious fallout poisoning the cattle in *Martin* might well cause more harm to the landowners' use and enjoyment of their property than the presence of unwanted persons among the public visiting a shopping center.

In the case before us, we are not dealing with a private

nuisance or a simple repeating trespass. Instead, we face a situation in which a very real public interest is at stake. In such a case, the court should not issue an injunction if it would cause serious injury to the public interest unless without the equitable relief the owner or his equivalent would experience a more serious injury.

Here, the public interest is well defined. Defendants seek to collect signatures to initiate public lawmaking. Or Const, Art IV, § 1. Oregon Revised Statutes chapter 250 is wholly devoted to the process of filing petitions and obtaining signatures. It does not create a right to go wherever one likes in pursuit of signatures, and often there will be no plausible showing of necessity to do so on someone else's property. This court recently held, however, that laws may only regulate, not entirely bar, entry even on residential property to reach people on matters of social or community interest. *City of Hillsboro v. Purcell,* 306 Or 547, 555-56 & nn 8-9, 761 P2d 510 (1988). One can hardly deny that the statutes recognize a right to sign petitions or to seek the signatures of others and a strong public interest in facilitating that process.

Plaintiff does not oppose the public policy of gathering petition signatures. It simply does not want the activity carried out on its private property, usurping space for which plaintiff paid and for which it charges its tenants. Plaintiff recognizes that the court must balance benefits and hardships in this equitable proceeding, alleging that "greater injury will be inflicted upon plaintiff by the denial of relief than will be inflicted upon defendants by granting relief."

Before addressing plaintiff's allegations, we evaluate the injunction's effect on the public interest. The signature-gathering process for political petitions is a form of political speech and no one contests that free speech is one of our society's most precious rights. As Justice Brandeis said in his concurring opinion in *Whitney v. California,* 274 US 357, 375, 47 S Ct 641, 71 L Ed 1095 (1927), "[t]hose who won our independence believed that * * * the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government." We might add that this is a fundamental principle of the Oregon government as well. No doubt defendants' activity involves a very important public interest.

But is that public interest seriously injured if defendants' activity is completely blocked at the Center? We believe that it is.

Plaintiff claims that defendants have full access to traditional public forums, such as the public park, sidewalks, and streets adjoining plaintiff's private property. But the public does not gather in the public park or use the outside sidewalks in great number. The process of gathering signatures is substantially impaired — almost doubled in time — if conducted on the public walkways or in parks instead of in the mall and on its walkways. Shopping malls have become part of American life. Large numbers of the public gather there. Although plaintiff tries to cloak a public mall as a private place, it is the antithesis of a private place.

We conclude that if defendants are denied access to plaintiff's private property, the public interest served by defendants' activity will sustain serious injury. But this conclusion alone does not decide the issue before us. We must address whether plaintiff has proven that defendants' activities will seriously injure the commercial enterprise at the Center.

Plaintiff's complaint overstates its right to equitable relief. Taking plaintiff's position literally, it could open the malls, walkways, and other common areas of the Center generally to the stream of visitors on which a shopping mall depends but forbid some or all of these visitors from discussing politics while window shopping or sharing a meal; it could allow solicitors to circulate petitions for measures favorable to its business interests but not for measures that it opposes; it could (if there were no law to the contrary) exclude members of some races, religions, or ethnic groups collectively or individually without explanation if that were deemed to enhance the atmosphere motivating its desired customers; and it could demand the aid of equity to enforce the exclusions, all in the name of "trespass." Such an argument evokes memories of claims made a generation ago by branch managers of national corporations in segregated communities before the passage of

open accommodation laws.[6] *See, e.g., Bell v. Maryland,* 378 US 226, 242, 84 S Ct 1814, 12 L Ed 2d 822 (1964) (Douglas, J., concurring); 2 Emerson, Haber & Dorsen, Political and Civil Rights in the United States 2114-15 (3d ed 1967); Paulsen, *The Sit-in Cases of 1964: "But Answer Came There None,"* 1964 Sup Ct Rev 137.

Of course, plaintiff does not exercise political discrimination among those who may enter its common areas, it only postulates a theoretical right to do so. But courts need not issue declaratory or injunctive orders for hypothetical cases. In practical terms, plaintiff seeks to maintain the appearance of a shopping district open to the general public and also to prevent conduct deemed to interfere with its tenants' commercial objectives, preferably by forbidding any persons from gathering petition signatures on Center property.

Plaintiff asks too much. The record clearly demonstrates that plaintiff and plaintiff's tenants want no political activity carried on at the mall and the trial court granted what amounts to an absolute prohibition against such activity. Equity simply will not spread a complete blanket over all political activity. People can and do peaceably and unobtrusively talk politics at the Center without creating a need for the extraordinary remedy of an injunction forbidding people engaged in this type of political activity from even venturing onto the property. The trial court went too far in issuing an injunction providing that "defendants are hereby restrained and enjoined from entering upon plaintiff's property to exercise their expressions of opinion." Clearly they can if they do so reasonably, quietly, and peaceably. But defendants are not entitled to engage in noisy exhortations or street theater to

---

[6] Indeed, the United States Supreme Court, in *Lloyd Corporation v. Tanner,* 407 US 551, 567-68, 92 S Ct 2219, 33 L Ed 2d 131 (1972), made a point of speaking of property privately owned and used "nondiscriminatorily." The United States Supreme Court's passing reference to "nondiscriminator[y]" private use does not explain why, if equity will unquestioningly enjoin "trespass," plaintiff could not allow partisans of a cause it approved to distribute leaflets or collect signatures and demand an injunction against persons whose views it opposes.

The conundrum dissolves if one recognizes that an injunction is a discretionary and "extraordinary" remedy that may be withheld even without reference to a statute or constitutional clause. *York v. Stallings, supra,* 217 Or at 19. This also eliminates the previous restraint inherent in enjoining people from entering or remaining in the common areas of the Center only because of their political message. *See Near v. Minnesota,* 283 US 697, 51 S Ct 625, 75 L Ed 1357 (1931).

express those opinions. In short, defendants cannot be enjoined from entering the Center to express their opinion, so long as they do so reasonably and without interfering with plaintiff's commercial enterprise.

■ The main focus of this litigation, however, is not on casual or benign political discussion, but on the activities of defendants in gathering petition signatures in the Center's common areas. This presents an entirely different question and goes far beyond nonobtrusive expressions of opinion. It involves the stopping of potential customers and the distraction of those customers from plaintiff's commercial enterprise. Plaintiff, with remarkable prescience, pleaded the essence of the tests we have set forth as a predicate for the relief it seeks. Plaintiff alleged that it will suffer "great and irreparable injury" by virtue of defendants' activities and that "defendants' activity has unreasonably interfered with the plaintiff's use of the property."

The record reveals that some of the signature-gathering activity does temporarily interfere with the commercial activity at the Center. Some gatherers apparently "buttonhole" potential customers and others set up card tables in heavily trafficked areas to facilitate the project at hand. Such obtrusive activity can be enjoined. But not *all* petition signature-gathering activity on plaintiff's premises can be enjoined.

The trial court went too far in issuing an injunction providing that "defendants are hereby restrained and enjoined from entering upon plaintiff's private property to exercise their expressions of opinion or to gather signatures in the initiative and referendum process without plaintiff's permission or consent." Clearly they can if they do so reasonably and peaceably. Moreover, plaintiff is not entitled to an injunction to prohibit peaceful solicitation of signatures in the mall or on its walkways that does not substantially interfere with the commercial activity on the premises. The solicitation of signatures of patrons does not in and of itself constitute substantial interference. The public policy behind the signature-gathering process limits equitable enforcement of plaintiff's preferred total exclusion of signature solicitors.

The court may, however, issue an injunction imposing reasonable restrictions on any attempted possession (*e.g.,*

setting up card tables) by defendants of any part of plaintiff's premises and may also place reasonable restrictions on the time, place, and manner of seeking petition signatures in plaintiff's mall and on its walkways so as to reduce or eliminate interference and distraction, short of confining signature solicitors to the least traveled byways and to times when few people are at the Center. The number of petition signature-gatherers may also be limited.

In designing reasonable time, place, and manner rules, a court can draw on other instances in which political and social action have been accommodated with other activities both on public and on private property, as for instance in labor relations. In an earlier case brought by plaintiff against petition signature solicitors (not appealed), *Lloyd Corp., Ltd. v. Stachon, et al.* (Multnomah County Cir Ct No. A8406-03528), then Circuit Judge William Dale in fact entered such a detailed and qualified order. We express no view about its particular provisions, which rested on the record made in that case, but it shows that a detailed order can be devised.

It bears repeating, to avoid misunderstanding, that the only issue which must be decided in this case as to plaintiff's claim is the scope of equitable intervention, not all legal rights and liabilities that might arise from the acts of either party. An equitable order may be denied, limited, or qualified regardless whether a defendant technically is a trespasser or a nuisance-maker. When an order protects plaintiff's main interest in eliminating or minimizing interference with its tenants and their customers, any residual legal issues may well be left to plaintiff's remedies at law.

## III.

In this case, if a declaratory judgment and injunction properly applies ordinary equitable principles, it also will not violate the constitutional rights of plaintiff. Article I, section 10, of the Oregon Constitution entitles plaintiff to a "remedy by due course of law for injury done" to its property interest; it does not entitle plaintiff to equitable intervention in advance of any injury. A proper order will not create an easement for signature-gatherers or anyone else, nor otherwise take plaintiff's property for public use without due process or just compensation contrary to Article I, section 18, of the Oregon Constitution or to the Fourteenth Amendment. *See*

*Pruneyard Shopping Center v. Robins,* 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980).

We need not engage in any federal or state constitutional declaration. We do not express any opinion as to the dissent's constitutional analysis. Both sides asked for more than they are entitled to on the present record. There is no proper declaratory or injunctive order. The circuit court's injunction is lifted, because it went far beyond its justification. The declaratory judgment issued by the circuit court also is too broad and too general.[7] The declaratory judgment of the trial court merely incorporates from the complaint plaintiff's phrasing that "plaintiff is entitled to exclude defendants from going on plaintiff's property for any purpose other than shopping or doing business with plaintiff or its tenants." The case is remanded to the circuit court for preparation of an order consistent with the equitable principles discussed herein.[8]

We do not award costs or attorney fees.

**PETERSON, C. J.,** dissenting.

I join in the opinion of Justice Carson. I am impelled to add that the majority, without unction, has interred over one hundred years of good trespass injunction law. This three-sentence opinion will be its only tombstone.

**CARSON, J.,** dissenting.

## I. MAJORITY'S ANALYSIS

## A. INTRODUCTION

Shorn of its obfuscating fleece, the majority opinion holds that trespassers may not be enjoined from further trespassing so long as the trespassers are gathering signatures for an initiative petition. Because I believe that this case should be analyzed differently and resolved in plaintiff's favor, I dissent.

---

[7] These are not the same. *See State v. Robertson,* 293 Or 402, 649 P2d 569 (1982).

[8] Contrary to the Chief Justice's fevered nightmare that the skies of trespass law are falling, the issue in this case is not the law of trespass; it is only the discretionary use of equitable injunctions against conduct that a jury, in a case at law, might find to be a trespass.

## B. THE MAJORITY'S ANALYSIS IS NOT SUBCONSTITUTIONAL

After stating the facts amidst occasional hypothesizing, the majority is emphatic in stating the well-recognized principle that a court should avoid constitutional adjudication when it may decide a case by resort to ordinary legal premises. This is a sound principle, established, no doubt, in deference to the legislature. It is the legislature, rather than this court, that should balance and accommodate competing public policies and interests. When possible, courts should thus avoid the "granite of constitutional adjudication." *Cologne v. Westfarms Associates,* 192 Conn 48, 469 A2d 1201, 1210 (1984).

The majority states that it "will discuss constitutional provisions and interpretations without *necessarily* deciding any constitutional right or violation." 307 Or at 680. (Emphasis added.) The majority's use of the word "necessarily" is puzzling. Does the majority wish to allow readers to divine for themselves whether the majority in fact decides constitutional rights or violations? Is the majority uncertain whether it determines constitutional rights or violations? Or, is the majority attempting to communicate that it unnecessarily decides constitutional rights or violations? In any event, a plain reading of the majority opinion makes it abundantly clear that the majority expressly decides several constitutional issues while swearing allegiance to the rule against premature constitutional adjudication.

The majority comes on as a law court in chancellor's clothing. In the guise of performing only a subconstitutional analysis, the majority states:

"In this case, if a declaratory judgment and injunction properly applies ordinary equitable principles, it also will not violate the constitutional rights of plaintiff. Article I, section 10, of the Oregon Constitution entitles plaintiff to a 'remedy by due course of law for injury done' to its property interest; it does not entitle plaintiff to equitable intervention in advance of any injury. A proper order will not create an easement for signature-gatherers or anyone else, nor otherwise take plaintiff's property for public use without due process or just compensation contrary to Article I, section 18, of the Constitution or to the Fourteenth Amendment. *See Pruneyard Shopping Center v. Robins,* 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980)." 307 Or at 688.

Thus, even though the majority declares that "[w]e need not engage in any federal or state constitutional declaration," 307 Or at 689, it is clear that the majority has made several important Oregon constitutional holdings—(1) that plaintiff cannot get an injunction to remedy the present injury resulting from defendants' threatened future trespass and nuisance; and (2) that under a proper order, there will be no unconstitutional taking of plaintiff's property. The majority opinion clearly is not a subconstitutional analysis, and the majority should acknowledge that it has made constitutional holdings.

The majority's constitutional holdings merit further comment. The majority notes that "[a] court applying a common-law rule or fashioning an equitable order must observe constitutional principles as much as a legislative or administrative body." 307 Or at 680. The majority then states the standard for determining whether a constitutional analysis is required: "Whether a judicial decision of a private claim invades constitutional rights depends on whether the remedy fashioned by the court invades constitutional rights." 307 Or at 680. Inexplicably, the majority ignores this standard.

The majority's conclusory holding that "Article I, section 10, of the Oregon Constitution entitles plaintiff to a 'remedy by due course of law for injury done' to its property interest; it does not entitle plaintiff to equitable intervention in advance of any injury," presumes that plaintiff has not suffered harm from defendants' threat to continue to trespass unless enjoined. The evidence in the record makes it clear that plaintiff's tenants do not want political activities carried on in the Center. It follows that if defendants are allowed compelled access to plaintiff's private property, plaintiff's property interest will incur present injury from defendants' threats to continue to trespass and create a nuisance because plaintiff would not be able to demand the same rents that it otherwise could, especially for space near compelled access sites. The majority recognizes that allowing defendants compelled access to plaintiff's private property under a "proper order" would cause injury to plaintiff's property interest:

> "The court may, however, issue an injunction imposing reasonable restrictions on any attempted possession * * * by defendants of any part of plaintiff's premises and may also place reasonable restrictions on the time, place, and manner of seeking petition signatures in plaintiff's mall and on its

walkways so as to *reduce* or eliminate *interference and distraction* [in the mall] * * *.

"* * * * *

"* * * When an order protects plaintiff's main interest in eliminating or *minimizing interference* with its tenants and their customers, any residual legal issues may well be left to plaintiff's remedies at law." 307 Or at 687-88. (Emphasis added.)

Because the majority cannot properly issue an order which violates plaintiff's constitutional rights and because the so-called remedy fashioned by the majority opinion undoubtedly will injure plaintiff's constitutional rights under Article I, section 10, the majority opinion should have fully analyzed plaintiff's constitutional right to a "remedy by due course of law for injury done."

Even though the remedy fashioned by the majority will injure plaintiff's property rights, the majority refuses to engage in an Article I, section 10, discussion. Thus, the majority opinion reads into Article I, section 10, a requirement that a remedy may be obtained only for certain types of injuries, *e.g.,* for an injury which is more than minimal or for an injury which has not been reduced or minimized. Article I, section 10, does not expressly or impliedly state that an injury must rise to a certain severity before it will be recognized as actionable; rather, this section provides that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

The majority's constitutional holding that "[a] proper order will not create an easement for signature-gatherers or anyone else, nor otherwise take plaintiff's property for public use without due process or just compensation contrary to Article I, section 18, of the Oregon Constitution or to the Fourteenth Amendment," 307 Or at 688, is absolutely devoid of analysis. The majority made this important Oregon constitutional holding with nothing more than a mere conclusory statement. The majority did cite a United States Supreme Court case for authority, but Oregon constitutional provisions are examined independent of federal analysis.[1] The

---

[1] *See* Linde, *First Things First: Rediscovering the States' Bills of Rights,* 9 U Balt L Rev 379 (1980).

Oregon Constitution, like the California State Constitution, certainly may be interpreted as providing more protection under these circumstances than the federal constitution. *See Pruneyard Shopping Center v. Robins,* 447 US 74, 81, 100 S Ct 2035, 64 L Ed 2d 741 (1980). That the majority interpreted Article I, section 18, consistently with federal standards is no excuse for lack of reasoned analysis under Oregon law.

Also, the majority opinion fails to articulate any test for determining what constitutes a taking without just compensation. Apparently, the use and nature of the private property is a consideration. Here a large mall is at issue, but what is the rule? Does size make a difference? If so, where is the cutoff—a mid-size shopping center, a free-standing grocery store, a convenience store, a small neighborhood store? Does the fact that a mall attracts large numbers of people make a difference? If so, where is the line with respect to other places where large numbers of people congregate, affording superior opportunities for signature-gathering, such as sports stadiums, convention halls, theaters, large office or apartment buildings, factories, supermarkets, or department stores? The majority provides no guidance.

The nature of the signature-gathering apparently is also a consideration, but the vague directive the majority gives is that under a "proper order" there will be no taking without just compensation. Evidently, a "proper order" means an order stating reasonable time, place, and manner rules, but the majority should provide guidance as to what would constitute a proper order.[2]

In sum, the majority's opinion clearly is not subconstitutional. Therefore, the majority's statement that "we conclude on a subconstitutional level that plaintiff is not entitled to the broad injunction it sought and received," 307 Or at 680, is simply incorrect. The majority's approach to this case requires constitutional holdings which should be addressed with reasoned analysis.

---

[2] The majority opines: "Clearly [defendants can gather signatures upon plaintiff's private property] if they do so reasonably, quietly, and peaceably. But defendants are not entitled to engage in noisy exhortations or street theater to express those opinions." 307 Or at 686-87. This statement, however, provides little guidance.

## C. THE MAJORITY OPINION GOES TOO FAR

I now turn to the majority's discussion and holding concerning the trial court's injunction which provides, in part, that "defendants are hereby restrained and enjoined from entering upon plaintiff's property to exercise their expressions of opinion." The majority correctly recognizes that this part of the injunction goes too far, but the majority opinion also goes too far.

Simply stated, the facts are that "[i]n December 1985, defendants entered the Center to gather signatures on three initiative petitions."[3] 307 Or at 678-79. Defendants did not "peaceably and unobtrusively talk politics at the Center." 307 Or at 686. Because the instant facts involve signature-gathering rather than mere expression of opinion, the portion of the trial court's injunction about "expression of opinion" should be stricken. Rather than dealing with this part of the trial court's injunction in this simple and straightforward manner, the majority lapses into a lengthy and emotional discussion, and even concludes with a holding: "[D]efendants cannot be enjoined from entering the Center to express their opinion, so long as they do so reasonably and without interfering with plaintiff's commercial enterprise." 307 Or at 687. Because this discussion and holding have absolutely nothing to do with the facts and are unnecessary to the disposition of this case, they constitute dicta.

"If dicta had the force of law, I could perhaps understand [the majority's indulgence in dicta]," but "[i]t does not, and I object to 'unnecessarily broad dicta,' which merely serves to confuse analysis." *State v. Freeland,* 295 Or 367, 384, 667 P2d 509 (1983) (Jones, J., dissenting; citation omitted). Dicta not only muddies the waters, but also is often wrong. Additionally, "[w]e should not write dicta where we do not fully foresee the implications of our analysis or advice." *Haynes v. Burks,* 290 Or 75, 97, 619 P2d 632 (1980) (Tanzer, J., specially concurring).

There are many ways for persons "to exercise their

---

[3] The initiative petitions were to (1) prohibit mandatory local measured telephone service; (2) supersede the statutory definition of "radioactive waste" and change the energy facility study payment procedure; and (3) prohibit nuclear power plant operation until a permanent waste site is licensed.

expressions of opinion" upon plaintiff's private property; some might not be trespassers, but some might be trespassers and, if so, could be barred from the Center by injunction. For example, if a person were to enter plaintiff's private property for the sole purpose of displaying a political sign while quietly walking throughout the Center, he might be a trespasser; but if several people were casually to discuss a political candidate while shopping at the Center (that is, while upon plaintiff's private property for a purpose within the scope of plaintiff's invitation to be there), they might not be trespassers. Because expressions of opinion take myriad forms and involve countless factual settings, the majority's extensive and overbroad dicta should be ignored.

Apparently, as justification for its holding on facts not presented in this case, the majority goes through a number of hypotheticals. For example, the majority states: "Taking plaintiff's position literally * * * it could allow solicitors to circulate petitions for measures favorable to its business interests but not for measures that it opposes." 307 Or at 685. Despite the majority's statement that "[o]f course, plaintiff does not exercise political discrimination among those who may enter its common areas, it only postulates a theoretical right to do so," 307 Or at 686, it is the majority that is postulating plaintiff's rights to do so, not plaintiff. The majority states that "courts *need not* issue declaratory or injunctive orders for hypothetical cases." 307 Or at 686. (Emphasis added.) But this is not the rule. Simply stated, "[d]eciding hypothetical cases is not a judicial function." *Oregon Cry. Mfgs. Ass'n v. White,* 159 Or 99, 109, 78 P2d 572 (1938). Furthermore, "[n]either can courts, in the absence of constitutional authority, render advisory opinions." *Id.* To be sure, the majority's dicta does not merely explain something, rather the majority makes a holding based upon facts not at issue. Accordingly, the majority renders an advisory opinion based upon its own hypotheticals. Thus, this part of the majority's opinion should be replaced with a simple statement that the part of the trial court's injunction relating to expression of opinion is improper because it reaches too far.

### D. THE MAJORITY'S BACKGROUND DISCUSSION OF TRESPASS AND NUISANCE IS BLENDED AND WRONG

I now turn to the majority's convoluted discussion of nuisance and trespass. Although the same conduct may constitute both a trespass and a nuisance, they are distinct torts.

Furthermore, the question of whether an injunction should issue is analyzed differently under trespass and nuisance. The majority's implied assumption that there is no distinction between the law of trespass and nuisance is incorrect.

The majority begins its discussion of continuing trespass and nuisance law with a partial statement of continuing trespass law. Rather than fully stating the law of continuing trespass, the majority then obscures continuing trespass law by making the misleading and overbroad statement that "an injunction remains discretionary and subject to equitable considerations; it is not available as a matter of right." 307 Or at 681. The majority then blends continuing trespass law and nuisance law by citing two inapposite nuisance cases as support for this overbroad statement about continuing trespass law.[4] The majority next provides an inapposite quote from *Martin et ux v. Reynolds Metals Co.,* 221 Or 86, 342 P2d 790 (1959), *cert den* 362 US 918 (1960).[5] The majority concludes by

---

[4] In *Atkinson v. Bernard, Inc.,* 223 Or 624, 633, 355 P2d 229 (1960), the court stated that when "the aid of equity is sought to enjoin all or part of the operations of a private airport * * * the law of nuisance rather than that of trespass applies" because "nuisance theory is in accordance with modern thinking in the field, and with common sense." The court felt that in such cases nuisance law was more appropriate than the privileged trespass rule of the Restatement of Torts § 194 (1934), because the Restatement rule "attempts to pour new wine into the old bottle of trespass" while "[t]he flexibility of nuisance law enables the trial judge to take into consideration, openly with proper pleadings and evidence, all relevant factors which will assist him in balancing the interests of the parties before the court in light of relevant public interest." *Atkinson v. Bernard, Inc., supra,* 223 Or at 633. In short, *Atkinson* involved nuisance law because of the unique circumstances of air travel.

By stating that "in *York v. Stallings,* 217 Or 13, 341 P2d 529 (1959), the court characterized as a 'nuisance' the invasion of landowners' property by a particulate fallout and noise from a sawmill," 307 Or at 681, the majority apparently suggests that courts simply choose whether to apply trespass or nuisance law. The majority is incorrect. Pleading determines whether trespass or nuisance law or both apply in a given case. In *York,* the court applied nuisance law because the plaintiff filed a suit "to enjoin defendants, who operate a sawmill, from interfering with the *use and enjoyment* of plaintiffs' premises and to recover damages." 217 Or at 14. (Emphasis added.)

The point to bear in mind is that neither *Atkinson* nor *York* stand for the overbroad proposition that under continuing trespass law "an injunction remains discretionary and subject to equitable considerations; it is not available as a matter of right." 307 Or at 681.

[5] Apparently, the majority provides this quote to demonstrate that trespass involves balancing. This is true, but only in a very narrow sense. As *Martin* states, "trespass involves a weighing process, similar to that involved in the law of nuisance, although to a more limited extent than in nuisance and for a different purpose, *i.e.,* in the one case to define the possessor's interest in exclusive possession, and in the other to define the possessor's interest in use and enjoyment." *Martin et ux v. Reynolds*

stating that "the cases show that invasions of another's real property are not always enjoined, even when the invasion qualifies as 'trespass' for purposes of liability for damages." 307 Or at 683; *see also* 307 Or at 687-89. This proposition is terribly misleading because it is grossly overbroad and incorrectly implies that trespass law is devoid of structured rules.[6] The majority has cited only inapposite cases for this proposition,[7] and has failed to cite even one relevant *trespass* case as support.

In short, in a desperate attempt to avoid a proper continuing trespass analysis, the majority has ignored existing law, cited inapposite cases, blended trespass and nuisance law, and made overbroad statements. Furthermore, because the majority turns its decision on nuisance law, everything that the majority states about trespass law is dicta and should be ignored.

## E. THE MAJORITY'S NUISANCE ANALYSIS IS WRONG

The majority does not expressly state that it is employing nuisance law, but it does. The majority holds:

"The trial court went too far in issuing an injunction providing that 'defendants are hereby restrained and enjoined from entering upon plaintiff's private property to exercise their expressions of opinion or to gather signatures in the initiative and referendum process without plaintiff's permission or consent.' Clearly they can if they do so *reasonably* and peaceably. Moreover, plaintiff is not entitled to an injunction to prohibit peaceful solicitation of signatures in the mall or on

---

*Metals Co.,* 221 Or 86, 96, 342 P2d 790 (1959), *cert den* 362 US 918 (1960).

Furthermore, not all trespass cases involve balancing. *Martin* suggests that in cases not involving a "familiar trespass pattern" a preliminary question must be addressed in determining whether the intrusion at issue is actionable in trespass: "[W]here neither the defendant's conduct nor the plaintiff's use fall[s] within the familiar trespass pattern of the past the courts are faced with a preliminary inquiry as to whether the plaintiff has a protectible interest under the law of trespass." *Id.* at 95. The familiar trespass pattern obviously includes a person placing his foot upon the land of another, without authorization to do so. Because defendants' conduct of physically invading the surface of plaintiff's land falls within the familiar trespass pattern, the above preliminary question need not be considered in the instant case.

[6] Below is a thorough discussion of injunction rules relating to continuing trespass.

[7] *See* notes 4 and 5 *supra,* and accompanying text.

its walkways that does not *substantially interfere* with the commercial activity on the premises. The solicitation of signatures of patrons does not in and of itself constitute *substantial interference*. The public policy behind the signature-gathering process limits equitable enforcement of plaintiff's preferred total exclusion of signature solicitors." 307 Or at 687. (Emphasis added.)

The words "reasonably" and "substantially interfere" are labels that are used in determining whether a nuisance *exists,* but they do not apply under trespass law.

Although the majority applies nuisance law, the majority provides only a partial statement of this law: In a case in "which a very real public interest is at stake * * * the court should not issue an injunction if it would cause serious injury to the public interest unless without the equitable relief the owner or his equivalent would experience a more serious injury." 307 Or at 684.

The majority should have provided a complete discussion of nuisance law. A private nuisance "is an invasion of an individual's interest in the use and enjoyment of land." *Raymond v. Southern Pacific Co.,* 259 Or 629, 634, 488 P2d 460 (1971). An "interference with the use and enjoyment of land is not actionable unless that interference be both *substantial and unreasonable." Amphitheaters, Inc. v. Portland Meadows,* 184 Or 336, 348, 198 P2d 847 (1948) (emphasis added); *see also Jewett v. Deerhorn Enterprises, Inc.,* 281 Or 469, 473, 575 P2d 164 (1978). A "general weighing process" is used in determining the existence of a nuisance. *See Gronn et ux v. Rogers Construction, Inc.,* 221 Or 226, 232-33, 350 P2d 1086 (1960). "Whether a particular use of property constitutes an actionable nuisance cannot be determined by fixed general rules but depends on the individual facts of a particular case." *Jewett v. Deerhorn Enterprises, Inc., supra,* 281 Or at 473. This court, however, has used a number of guidelines in assessing each fact situation.[8] *See Jewett v. Deerhorn Enterprises, Inc., supra,*

_____

[8]

"Comprehensively stated these guidelines are the location of the claimed nuisance, the character of the neighborhood, the nature of the thing complained of, the frequency of the intrusion, and the effect upon the enjoyment of life, health and property." *Jewett v. Deerhorn Enterprises, Inc.,* 281 Or 469, 473, 575 P2d 164 (1978).

281 Or at 473; *Gronn et ux v. Rogers Construction, Inc., supra,* 221 Or at 233; *York v. Stallings,* 217 Or 13, 21-22, 341 P2d 529 (1959); *Amphitheaters, Inc. v. Portland Meadows, supra,* 184 Or at 361.

"An injunction does not issue as a matter of absolute or unqualified right" once a nuisance has been established. *Jewett v. Deerhorn Enterprises, Inc., supra,* 281 Or at 478. Rather, the court employs a second balancing test to determine whether a defendant's conduct should be enjoined. *See Jewett v. Deerhorn Enterprises, Inc., supra,* 281 Or at 478-80; *York v. Stallings, supra,* 217 Or at 22-26. *York* refers to this second weighing process as the "balancing doctrine." Although *York* does not clearly define the "balancing doctrine," a close reading of the case shows that this doctrine involves two components—the relative injuries to the parties (the "comparative injury doctrine," *see* 217 Or at 23) and to the interest of the public.

The comparative injury doctrine provides that a "court may refuse an injunction in certain cases where the hardship caused to the defendant by the injunction would *greatly* outweigh the benefit resulting to the plaintiff." *York v. Stallings, supra,* 217 Or at 22 (emphasis added); *see also Jewett v. Deerhorn Enterprises, Inc., supra,* 281 Or at 478.

*York* does not specifically state how the interest of the public factors into the balancing process. The public interest, however, must rise to the level of an *important* public interest before it will be given significant weight in the balancing process. *See Jewett v. Deerhorn Enterprises, Inc., supra,* 281 Or at 479. Furthermore, the public interest should be protected only from serious inconvenience or loss. *See York v. Stallings, supra,* 217 Or at 24. Accordingly, in this respect, a plaintiff's request for an injunction should be denied only if enjoining a defendant's conduct would amount to a serious public inconvenience or loss. Thus, in *York,* the court ordered that the case be remanded for further testimony concerning, *inter alia,* "the feasibility of transporting the sawdust to another place for burning or disposal and whether such a

program would be so burdensome as to cause a shut-down of the defendants' mill." 217 Or at 26.[9]

To be sure, a court need not decide whether to grant an injunction if there is no substantial and unreasonable interference with an individual's use and enjoyment of land; that is, if there is no nuisance. The majority, however, needlessly reaches the public interest issue because its nuisance analysis is backwards. A proper nuisance analysis first analyzes whether a nuisance exists, that is, whether there is a substantial and unreasonable interference with the use and enjoyment of land. Only if a nuisance exists does the analysis continue. The next step in the analysis is application of the "comparative injury doctrine." The final step is determining whether there is serious public loss or inconvenience. The majority, however, begins with a discussion of the public interest at issue,[10] and concludes by stating:

> "* * * Clearly [defendants] can [exercise their expression of opinion or gather petition signatures upon plaintiff's private property without plaintiff's consent] if [defendants] do so *reasonably* and peaceably. Moreover, plaintiff is not entitled to an injunction to prohibit peaceful solicitation of signatures in the mall or on its walkways that does not *substantially interfere* with the commercial activity on the premises." 307 Or at 687. (Emphasis added.)

This is just another way of saying that plaintiff is not entitled to an injunction for intrusions that do not constitute a nuisance. Thus, it is abundantly clear that the majority's analysis turns on whether a nuisance *exists*.

Apparently, the majority believes that plaintiff is entitled to an injunction for signature-gathering activity that constitutes a nuisance:

> "The record reveals that some of the signature-gathering activity does temporarily interfere with the commercial activity at the Center. Some gatherers apparently 'buttonhole'

---

[9] In the instant case, defendants have full access to traditional public forums. The question is whether a serious public inconvenience or loss would result if defendants are denied compelled access to plaintiff's private property. As discussed below, the answer to this question is simply no. If defendants use the traditional public forums for their activities (such as the public park, sidewalks, and streets adjoining plaintiff's private property), they, and likewise any public interest served by defendants, will suffer only marginal inconvenience.

[10] The majority states: "Before addressing plaintiff's allegations, we evaluate the injunction's effect on the public interest." 307 Or at 684.

potential customers and others set up card tables in heavily trafficked areas to facilitate the project at hand. Such obtrusive activity can be enjoined. But not *all* petition signature-gathering activity on plaintiff's premises can be enjoined." 307 Or at 687. (Emphasis in original.)

Thus, for "signature-gathering activity [that] does temporarily interfere with the commercial activity at the Center," the majority holds, without analysis, that (1) such activity constitutes a nuisance; (2) the "comparative injury doctrine" is decided in plaintiff's favor; and (3) enjoining such activity would cause no serious public loss or inconvenience.

At bottom, the majority badly confuses nuisance law.[11] It is, however, clear that the majority's analysis thus

---

[11] Below is an example of a traditional nuisance analysis which reaches the same result as the majority opinion. The majority should have used such an approach.

Plaintiff seeks an injunction against defendants for unreasonably interfering with plaintiff's use of its property. The first question is whether defendants' conduct constitutes a nuisance; that is, does defendants' conduct constitute a substantial and unreasonable interference with plaintiff's use and enjoyment of its land? Some of defendants' conduct is peaceful and not overly intrusive. Such activity simply does not rise to the level of a substantial and unreasonable interference, and therefore does not constitute a nuisance. Thus, for such conduct, a nuisance analysis ends here because no nuisance exists. Accordingly, under nuisance law, plaintiff is not entitled to an injunction to prohibit the peaceful and not overly intrusive solicitation of signatures in the Center.

The record, however, reveals that some of the signature-gathering activity does temporarily interfere with the commercial activity at the Center. For example, some gatherers apparently "buttonhole" potential customers and others set up card tables to facilitate the project at hand. Because activities such as these are unnecessarily intrusive, they are a substantial and unreasonable interference with plaintiff's use and enjoyment of its land and therefore constitute a nuisance.

The second query with respect to such intrusive conduct concerns the comparative injury doctrine; that is, would the hardship to defendants caused by an injunction greatly outweigh the benefit resulting to the plaintiff. Defendants state that they want compelled access to plaintiff's property for two reasons: (1) because plaintiff's private property provides shelter from the weather; and (2) because, in terms of the number of signatures obtained per hour, defendants find using plaintiff's private property more effective than using the traditional public forums surrounding plaintiff's property (one defendant testified that while he did not have studies, "[t]he amount of signatures on an hourly basis on a public sidewalk area would be in the area of twenty-five[, and t]he amount of signatures inside was over forty, on average"). Although it is not clear from the record how much of defendants' activities are intrusive, we conclude from this evidence that if defendants were denied compelled access to plaintiff's private property, defendants would sustain some, but not substantial inconvenience.

On the other hand, considering the hours that the Center is open, carrying on intrusive activity interferes with hundreds of customers per day. This interference constitutes a direct assault on the efforts of plaintiff and plaintiff's tenants to induce

turns on the first step of a nuisance analysis—whether a nuisance *exists*. Accordingly, the majority's discussion of the public interest is entirely unnecessary and irrelevant, and therefore constitutes dicta.

## II. THE DISSENT'S ANALYSIS

### A. DEFENDANTS' SIGNATURE-GATHERING ACTIVITIES UPON THE CENTER CONSTITUTE AN ENJOINABLE CONTINUING TRESPASS

The complaint states ultimate facts that defendants have trespassed upon the private property of the Center. Additionally, *the facts show that defendants are trespassers.* Thus, I would analyze this case under trespass law.[12]

A primary attribute of the possessory interest in property is the power to exclude others from using it. 5 Powell on Real Property ¶ 706[4] (1989). Accordingly, this court has defined trespass as "any intrusion [upon the land of another] which invades the possessor's protected interest in exclusive possession, whether that intrusion is by visible or invisible pieces of matter or by energy which can be measured only by the mathematical language of the physicists." *Martin et ux v. Reynolds Metals Co., supra,* 221 Or at 94. Clearly, an unauthorized physical intrusion by a person onto the land of another constitutes trespass because it interferes with the owner's protected interest in exclusive possession, and thereby use, of his land. Furthermore, it should be stressed that " '[e]very unauthorized entry on land of another is a trespass even though no damage is done.' " *Kesterson v. California-Oregon Power Co.,* 114 Or 22, 31, 228 P 1092 (1925) (quoting 38 Cyc. 995). Thus,

---

patrons to concentrate on shopping at the mall. Accordingly, under the comparative injury doctrine, plaintiff should be entitled to enjoin defendants' unnecessarily intrusive activity upon its private property.

The next question concerning the unnecessarily intrusive activity is whether an injunction would cause serious or substantial public inconvenience or loss. Here the relevant *public interest is facilitating* public participation in the law-making process. Because we have held that enjoining defendants' unnecessarily intrusive conduct would not cause defendants substantial inconvenience, the public interest served by defendants will likewise not sustain serious or substantial inconvenience or loss. Accordingly, under nuisance law, plaintiff is entitled to an injunction enjoining defendants' unnecessarily intrusive conduct.

[12] Because I conclude that plaintiff is entitled to an injunction under trespass law, nuisance law need not be addressed. It should be noted that a trespass analysis avoids judicial balancing of the parties' injuries.

"actual damage need not be shown in making out an actionable invasion" in trespass. *Martin et ux v. Reynolds Metals Co., supra,* 221 Or at 98.

Because a landowner is entitled to exclusive possession of his land, he decides the use of his land, subject to legal limitations,[13] which in turn determines the extent of his exclusive possession of his land. In other words, a landowner has the power to define the scope of his exclusive possession of land. A landowner who invites persons onto his land for designated purposes does not waive his right to exclusive possession; contrariwise, intrusions upon his land outside the scope of his invitation constitute trespass. Here plaintiff has invited the public onto the Center only for purposes related to the business of plaintiff and plaintiff's tenants, *e.g.,* browsing, shopping or obtaining services. Plaintiff has not extended an invitation for the public to enter the Center for any other purpose. By merely inviting the public onto the Center property for these limited purposes, plaintiff did not thereby lose its right to exclusive possession. Because defendants personally intruded upon the Center for a purpose outside the scope of plaintiff's invitation, defendants interfered with plaintiff's exclusive possession, and thereby use, of its land. Accordingly, defendants' conduct constitutes trespass. Furthermore, defendants' conduct constitutes a continuing trespass because they informed plaintiff that they would continue to trespass unless enjoined. *See Seufert Bros. v. Hoptowit et al.,* 193 Or 317, 237 P2d 949 (1951), *cert den* 343 US 926 (1952); *Chapman v. Dean,* 58 Or 475, 115 P 154 (1911).

To be sure, "[i]n a trespass case the social value of defendant's conduct, its efforts to prevent the harm and other circumstances that tend to justify an intrusion cannot be considered by the trier of the facts" in determining whether defendant's intrusion constitutes trespass. *Davis v. Georgia-Pacific,* 251 Or 239, 243, 445 P2d 481 (1968). Stated differently, trespass does not involve a weighing process; if an unprivileged intrusion invades the possessor's protected interest in exclusive possession, strict liability for trespass results. *See id.* Therefore, any social value produced by or effort which

---

[13] For example, a retailer may not refuse to do business with someone because of race, religion, sex, marital status, color, or national origin. ORS 30.670.

minimized the impact of defendants' intrusion onto the Center does not change the fact that defendants' conduct constituted trespass.

Plaintiff seeks to enjoin defendants' repeated trespass. A trespass will not be enjoined if there is an adequate remedy at law. *See, e.g., Oregon-Wash. R. & N. Co. v. Reed,* 87 Or 398, 417, 169 P 342, 170 P 300 (1918); *Garrett v. Bishop,* 27 Or 349, 354-55, 41 P 10 (1895). It is well-settled, however, that an injunction is the proper remedy in the case of a repeated trespass. *See, e.g., Seufert Bros. v. Hoptowit et al., supra,* 193 Or at 328; *Columbia Fishermen's Union v. St. Helens,* 160 Or 654, 664, 87 P2d 195 (1939); *Central Oregon Irr. Co. v. Whited,* 76 Or 255, 266, 142 P 779, 146 P 815 (1915); *Stotts v. Dichdel,* 70 Or 86, 91-93, 139 P 932 (1914); *Anderson v. Miami Lumber Co.,* 59 Or 149, 160, 116 P 1056 (1911); *Chapman v. Dean, supra,* 58 Or at 479-80. Where a continuing trespass is at issue, an action at law is inadequate because a multiplicity of actions would be required to vindicate the plaintiff's rights in damages. Stated differently, the rationale for allowing an injunction stopping a repeated trespass is to prevent the plaintiff from pursuing a judicial merry-go-round in a court of law. *Renken v. Harvey Aluminum (Incorporated),* 226 F Supp 169, 174 (D Or 1963) (applying Oregon law).[14] An injunction in the instant case clearly is an appropriate remedy in light of the fact that defendants told plaintiff that they would continue to trespass unless enjoined. *See Seufert Bros. v. Hoptowit et al., supra,* 193 Or at 328; *Chapman v. Dean supra.* Furthermore, an injunction is appropriate here because damages may be

---

[14] In *Chapman v. Dean,* 58 Or 475, 479, 115 P 154 (1911), Justice Burnett, using the following forceful reasoning, discussed the remedy afforded a complainant in equity:

"* * * where the trespass is continued, made up of successive acts, each comparatively unimportant in itself, and the threat and intention to continue is manifest, equity will enjoin the same, for the reason that each separate trespass forms a separate cause of action, and it would be idle to require the plaintiff to bring a distinct action for each one of the small trespasses. It would be a waste of time and serve no good purpose for the plaintiffs to bring an action at law for every different landing made by the defendants upon their land without authority. The actual damage accruing from each landing would be comparatively insignificant, and to try out each instance in an action at law would lead to a multitude of actions, the principles of which could be determined in one suit in equity."

*See also Minto v. Salem Water etc. Co.,* 120 Or 202, 219, 250 P 722 (1926); *Central Oregon Irr. Co. v. Whited,* 76 Or 255, 266, 142 P 779, 146 P 815 (1915); *Stotts v. Dichdel,* 70 Or 86, 91, 139 P 932 (1914).

uncertain and difficult to prove. *See Minto v. Salem Water etc. Co.,* 120 Or 202, 220, 250 P 722 (1926).

It is important to note that a continuing trespass analysis does not involve the "comparative injury doctrine"; that is, the parties' injuries are not balanced.[15] Public interest, however, is considered in continuing trespass, but only in a very limited manner. The applicable rule is stated in *Minto.* In *Minto,* the defendant was a company which contracted to supply the inhabitants of Salem with water. The defendant had an easement to use plaintiff's land for certain filtering systems, but made use of plaintiff's land in such a way as to exceed the scope of its easement. The plaintiff claimed defendant's use of his land beyond the scope of the easement constituted a continuing trespass and, accordingly, plaintiff sought an injunction. The court stated:

> "* * * Even though there has been a continuing trespass and a multiplicity of actions would result if the plaintiff were obligated to seek redress at law, equity will not raise its restraining arm if, by so doing, *great and irreparable injury might result to the public.* * * * We are not convinced that the present filtration system used by the defendant is the *only* way in which an adequate amount of pure water can be supplied. As a matter of *economy* and *convenience* it may excel any other plan, but such reasons * * * should [not] cause a court of equity to refuse the equitable relief sought." *Minto v. Salem Water etc. Co., supra,* 120 Or at 219. (Emphasis added.)

*See also Bennett v. City of Salem,* 192 Or 531, 546-47, 235 P2d 772 (1951); *Fraser v. Portland,* 81 Or 92, 98, 158 P 514 (1916); *Booth-Kelly Lumber Co. v. Eugene,* 67 Or 381, 384-85, 136 P 29 (1913). When a plaintiff seeks to enjoin a continuing trespass and a public interest is involved, *Minto* makes it clear that an injunction will be denied only where the issuance of the injunction would cause great and irreparable injury to the public, and that where those seeking to serve the public interest have an alternative means to meet the public interest, matters of economy and convenience will not prevent the injunction from issuing.

---

[15] There is one exception to this rule. In cases where a structure is erected so that part of it encroaches upon the land of another, courts consider the parties' relative hardships; however, plaintiff's interests are accorded great weight in this weighing process. *See, e.g., Tauscher v. Andruss,* 240 Or 304, 308-09, 401 P2d 40 (1965).

The public interest at issue is facilitating public participation in the law-making process. The question, then, is: If defendants are enjoined from their continuing trespass upon plaintiff's private property, will great and irreparable injury result to this public interest? Defendants state that they want compelled access to plaintiff's property for two reasons: (1) because plaintiff's private property provides shelter from the weather; and (2) because, in terms of the number of signatures obtained per hour, defendants find using plaintiff's private property more effective than using the traditional public forums surrounding plaintiff's property. This evidence shows that if defendants were denied compelled access to plaintiff's private property, defendants, and likewise the public interest served by defendants, would only sustain marginal inconvenience. Thus, the relevant public interest would not suffer great and irreparable damage.[16] Furthermore, the inconvenience caused by relegating defendants to traditional public forums will not bind the arm of an equity court. Accordingly, plaintiff is entitled to an injunction to stop defendants' trespass upon its private property.

## B. DEFENDANTS HAVE NO ARTICLE I, SECTIONS 8 OR 26, CONSTITUTIONAL RIGHT TO GATHER SIGNATURES AT THE CENTER

I now turn to defendants' claims that they have constitutional rights to solicit signatures upon the Center's premises.[17] They do not.

---

[16] It should be noted that there is a lack of evidence showing that a denial of compelled access to the Center adversely has affected the initiative process. For instance, all three initiative petitions forming the basis of this case (see footnote 3) received sufficient signatures to qualify for the November 4, 1986, General Election.

[17] Defendants filed an answer and counterclaim for injunctive and declaratory relief, asserting:

"Defendants have a right under Article I, sections 8 and 26[,] of the Oregon Constitution and under Article IV, section 1[,] of the Oregon Constitution to gather initiative petition signatures in the Lloyd Center."

Defendants requested a decree as follows:

"(a) a decree restraining and enjoining plaintiff from attempting to eject defendants from Lloyd Center, threatening defendants with criminal prosecution for trespass, and bringing annual civil suits for injunction against them;

"(b) declaring under ORS [c]hapter 28 that defendants have a right under the Oregon Constitution to gather initiative petition signatures at Lloyd Center;

"(c) a judgment against plaintiff and in favor of defendants for defendants['] necessary costs and disbursements incurred by plaintiff herein;

"(d) for attorney fees pursuant to *Deras v. Myers,* 272 Or 47, 535 P2d 541 (1975);

"(e) for such other further relief as the court may deem equitable and just."

By way of background, the United States Supreme Court has decided the issue in this case under the United States Constitution. In *Lloyd Corp. v. Tanner,* 407 US 551, 92 S Ct 2219, 33 L Ed 2d 131 (1972), the plaintiffs, three anti-war activists, sought a declaratory judgment and an injunction restraining Lloyd Corporation from interfering with their distribution of anti-war literature within the Lloyd Center, coincidentally the same shopping center involved in the instant case. The plaintiffs claimed they had a right to distribute such literature in the Center under the First Amendment; no state constitutional or statutory provision was at issue. The Court noted that the purpose of the mall in the Lloyd Center is " 'to make shopping easy and pleasant, and to help realize the goal of maximum sales * * *. Here the shopper is isolated from the noise, fumes, confusion and distraction which he normally finds along city streets, and a controlled, carefree environment is provided,' " 407 US at 554, and that there was a "considerable effort being made to attract shoppers and prospective shoppers, and to create 'customer motivation' as well as customer goodwill." 407 US at 555.

The Court concluded that the argument of those seeking constitutionally compelled access to private property of the Center then existing

"* * * misapprehends the scope of the invitation extended to the public. The invitation is to come to the Center to do business with the tenants. * * * There is no open-ended invitation to the public to use the Center for any and all purposes, however incompatible with the interests of both the stores and the shoppers whom they serve." 407 US at 564.

The Court noted that the public property adjacent to the Center afforded the plaintiffs an alternative forum to convey their message, and that in fact the plaintiffs had "moved to these public areas and continued distribution of their handbills after being requested to leave the interior malls." 407 US at 567. The Court then stated that "[i]t would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist." *Id.*

The Court also stated that property does not "lose its private character merely because the public is generally

invited to use it for designated purposes," and that "[t]he essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center." 407 US at 569. The Court, therefore, held that the Center had not been dedicated "to public use as to entitle [the plaintiffs] to exercise therein the asserted First Amendment rights." 407 US at 570. Accordingly, the Court denied the plaintiffs access to the Center for the purpose of distributing handbills.

The case at bar involves trespass. Common-law courts have, for centuries, protected the right of an owner of real property to the exclusive use and possession of his property. Over those centuries, courts developed "strict and severe rules of the action of trespass" as a means of enforcing that right, for it has been a fundamental principle that "[i]n the bundle of rights, privileges, powers, and immunities that are enjoyed by an owner of real property, perhaps the most important is the right to the exclusive 'use' of the realty." Prosser & Keeton, The Law of Torts 67, § 13 (5th ed 1984). The power and duty of the courts of this state to protect that right by means of the common-law trespass action have never been questioned and are illustrated in dozens of this court's opinions, from *French v. Cresswell*, 13 Or 418, 422 (1886), to *Koos v. Roth*, 293 Or 670, 690, 652 P2d 1255 (1982).

More particularly, the right of retail shopkeepers to ask particular individuals to leave their premises is a firmly established principle of common law. Thus, this court's statement that "[t]he implied license or invitation to enter a store or restaurant may be revoked at any time as to any individual," *Penn v. Henderson*, 174 Or 1, 16, 146 P2d 760 (1944), is consistent with what appears to have been the settled rule at common law. *See, e.g., Silas v. Bowen*, 277 F Supp 314, 317-18 (D SC 1967); *Ramirez v. Chavez*, 71 Ariz 239, 226 P2d 143, 145 (1951); *Shramek v. Walker*, 152 SC 88, 149 SE 331, 335-36 (1929); *Johanson v. Huntsman*, 60 Utah 402, 209 P 197, 201 (1922).

This historic common-law right on the part of retail shopkeepers (and other landowners) has been confirmed and reinforced by the legislature, in the form of criminal laws which make trespass a crime. Simple trespass—that is, the unlawful failure to leave premises after being directed to do

so—has been a misdemeanor in Oregon at least since 1882, *see* 1 General Laws of Oregon § 1794, p 921 (Hill 1887), and it still is, ORS 164.245.[18]

In short, the right of a retail shopkeeper to revoke his invitation to particular members of the public at any time is a principle of Oregon law, both by statute and by common law.[19] Not once since Oregon became a state has this court intimated that sections 8 and 26, of Article I, somehow limit this historic right, or that they supersede the law of trespass and prevent it from operating against trespassers who wish to engage in conduct—including conduct constituting expression or assembly—that the landowner does not wish to have carried out upon his premises.

In *Tanner,* the United States Supreme Court stated that

"Although accommodations between the values protected by [the First, Fifth, and Fourteenth] Amendments are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." 407 US at 567.

---

[18] ORS 164.245 provides:

"(1) A person commits the crime of criminal trespass in the second degree if the person *enters or remains unlawfully* in or upon premises.

"(2) Criminal trespass in the second degree is a Class C misdemeanor." (Emphasis added.)

ORS 164.205 provides, in part, the following definitions:

"(3) 'Enter or remain unlawfully' means:

"(a) To enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public or when the entrant is not otherwise licensed or privileged to do so; or

"(b) To fail to leave premises that are open to the public after being lawfully directed to do so by the person in charge.

"(4) 'Open to the public' means premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required.

"(5) 'Person in charge' means a person, a representative or employe of the person who has lawful control of premises by ownership, tenancy, official position or other legal relationship."

[19] Of course, a retailer may not refuse to do business with someone because of race, religion, sex, marital status, color or national origin. ORS 30.670.

Likewise, this court has never granted such rights to trespassers such as defendants, and I perceive no reason to do so in the present case.

As discussed above, *Tanner* held that when a shopping center owner opens its private property to the public for the purpose of shopping, the First Amendment to the United States Constitution does not thereby bestow upon the public a right to use the shopping center for expressive purposes. The Fifth and Fourteenth Amendments to the United States Constitution protect certain private property rights. Although the First and Fourteenth Amendments safeguard certain rights of free speech and assembly, they simply do not affirmatively grant a right to exercise free speech or assembly rights upon the private property of another. Oregon's constitutional scheme is similar. Sections 10 and 18, of Article I, of the Oregon Constitution create certain private property rights. Although sections 8 and 26, of Article I, reserve certain free speech and assembly rights, these sections also do not expressly establish a privilege of compelled access to the privately owned property of another for the exercise of these rights.

Because the First and Fourteenth Amendments do not verbalize a right to exercise free speech rights upon another's privately owned property, and because free speech rights were at odds with private property rights in *Tanner,* the Court was faced with the decision whether to make private property rights subordinate to free speech rights. This court, likewise, is confronted with a similar decision under Oregon constitutional analysis. The *Tanner* Court, however, did not decide that case upon a freewheeling judicial policy declaration concerning which right it thought was superior. Rather, the Court simply focused upon whether, under the facts presented, property rights had to give way to free speech rights. The Court determined that such an accommodation was unnecessary. The *Tanner* Court's approach is sound.

This court need not impose its personal view of which of the Oregon constitutional rights at issue should control because an accommodation of the competing rights is not necessary. This court should not announce public policy because declaration of public policy is a legislative function. This court recently said:

"'* * * Some courts * * * have taken the further step that in the absence of statutory sources of public policy, a court should articulate and justify rules of law in terms of policy (described a bit self-servingly as 'public' or 'social' policy), in other words, adopt a legislative mode of making policy rather than a judicial search for policy made by others or for the implications of existing principles. * * *

"We * * * have not embraced freewheeling judicial 'policy declarations' * * *." *Donaca v. Curry Co.,* 303 Or 30, 35, 734 P2d 1339 (1987). (Footnote omitted.)

While it is true that the legislature has been asked at least twice to create a statutory "right" on the part of members of the public to use private shopping center premises for the purpose of gathering petition signatures (*see* SB 800, 1985 Legislative Session, and SB 532, 1981 Legislative Session), the legislature has yet to announce public policy on this issue. Of course, the failure of the legislature to act does not determine or set policy. I would adopt the *Tanner* Court's approach, and thereby allow the legislature to consider and accommodate the competing public policy rights and interests at issue. If the legislature enacts legislation allowing compelled access to privately owned property for signature-gathering, this court, when presented with the proper case testing the constitutionality of such legislation, would fulfill its judicial role of determining whether the legislature exceeded constitutional bounds in enacting such legislation.

As noted above, the *Tanner* Court's decision turned on several factual determinations—that alternative means of communication existed and that Lloyd's privately owned property had not been dedicated to public use as to entitle the plaintiffs to exercise expressive rights thereon. Because *Tanner* involved the same shopping center with substantially the same facts and issues involved in this case, I find *Tanner* uniquely helpful to the disposition of the case at bar.

I now return to the facts in discussing plaintiff's claims. Has plaintiff dedicated its privately owned property to the public for the purpose of gathering initiative petition signatures? If plaintiff so dedicated his privately owned property, this analysis would end because there would be no conflict between free speech and assembly rights and private property rights. The Center was built and is operated purely for commercial purposes. As alluded to in *Tanner,* the public is invited

into the Center only for purposes related to the business of plaintiff and plaintiff's tenants, *e.g.,* browsing, shopping or obtaining services. Plaintiff has not extended an invitation for the public to enter the Center for any other purpose. The Center simply did not lose the private character and become the functional equivalent of a town square merely because plaintiff invited the public to use the facilities for designated commercial purposes. This conclusion is not at all affected by the fact that the Center has parking areas and interior walkways that contain gardens, art, benches, directories, information booths and other facilities for the convenience of business patrons. Therefore, there has been no dedication of plaintiff's privately owned and operated shopping center to public use as to entitle defendants to exercise Article I, sections 8 and 26, rights thereon.[20]

In explaining defendants' constitutional claims, I return to the question whether adequate alternative avenues of obtaining initiative petition signatures exist. Similar to the circumstances in *Tanner,* the record in the instant case reveals that compelled access to plaintiff's private property is not necessary for defendants to gather initiative petition signatures. On the contrary, as previously set forth, if defendants are relegated to the traditional public forums (*e.g.,* public sidewalks and streets) surrounding plaintiff's private property, defendants will be only marginally inconvenienced in their signature-gathering process. This process will only be slowed down, not blocked. Accordingly, it would be an unwarranted infringement of plaintiff's property rights to require plaintiff to yield to the exercise of Article I, sections 8 and 26, rights under circumstances where adequate alternative avenues of obtaining initiative petition signatures exist.[21]

Although this court interprets its own state laws and constitution independent of the holdings of federal decisions, the approach and reasoning of *Tanner* is sound and there is no reason to carve out a different solution under Oregon law. Because plaintiff's privately owned property had not been dedicated to public use as to entitle defendants to exercise free speech and assembly rights thereon and because alternative

---

[20] *Lloyd Corp. v. Tanner,* 407 US 551, 567-70, 92 S Ct 2219, 33 L Ed 2d 131 (1972).

[21] *See Lloyd Corp. v. Tanner, supra,* n 21 at 566-67.

means of gathering initiative petition signatures exist, I conclude that defendants may not exercise the free speech and assembly rights protected by Article I, sections 8 and 26, of the Oregon Constitution on property privately owned and used nondiscriminatorily for private purposes.

## C. AN INJUNCTION WOULD NOT VIOLATE DEFENDANTS' CONSTITUTIONAL RIGHTS

The fundamental question here is whether an injunction consistent with this dissent would restrain defendants' rights provided in Article I, sections 8 and 26. It would not.

Although the United States Supreme Court appears to have glossed over a state action analysis in *Tanner*,[22] I must squarely face the issue whether the issuance of an injunction consistent with this dissent would implicate Article I, sections 8 and 26, of the Oregon Constitution. Sections 8 and 26 apply only if a "law" has been "passed." The question, then, is whether a court-ordered injunction is a "law" which has been "passed." A plain reading of the phrase "[n]o law shall be passed" suggests that it is a restriction upon lawmakers other than courts, because courts do not pass laws, courts issue opinions. *State v. Spencer,* 289 Or 225, 228, 611 P2d 1147 (1980), stated that "[Article I, section 8,] is a prohibition on the legislative branch. It prohibits the legislature from enacting laws restraining the free expression of opinion or restricting the right to speak freely on any subject." The issuance of an injunction is not the equivalent of the passage of law by the legislature. It does not follow, however, that courts are not subject to the restrictions of Article I, sections 8 and 26, of the Oregon Constitution.

In *Crouch v. Central Labor Council,* 134 Or 612, 293 P 729 (1930), the plaintiff obtained an injunction barring certain picketing activities by labor unions in front of the plaintiff's restaurants. The court eliminated a portion of the injunction which prohibited the Oregon Labor Press from displaying to the public a "copy of the Oregon Labor Press containing any reference whatsoever to plaintiff or his said places of business." In narrowing the injunction to comply with Article I, section 8, the court stated:

---

[22] It appears that the state action question was coterminous with the issue of whether the land was dedicated to the public for First Amendment purposes.

> "The courts are as much subject to the Constitution of the state as is the legislature of the state. The courts should not make an order in violation of said [A]rticle I, section 8, of the Constitution, though that section itself refers only to a law." 134 Or at 622.

Two other cases support the proposition that courts should not act in violation of Article I, section 8. In *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979), the court held that Article I, section 8, prohibits the award of punitive damages in defamation cases. This holding was extended to prevent an award of punitive damages for intentional infliction of emotional distress by verbal means in *Hall v. The May Dept. Stores,* 292 Or 131, 637 P2d 126 (1981). Both *Wheeler* and *Hall* impliedly rest upon the proposition that a *court* may not infringe upon the free speech and expression rights contained in Article I, section 8.[23]

In short, a court may not make an order in violation of Article I, sections 8 and 26. Accordingly, I would not follow the decisions in *Woodland v. Michigan Citizens Lobby,* 423 Mich 188, 378 NW2d 337 (1985), and *Jacobs v. Major,* 139 Wis 2d 492, 407 NW2d 832 (1987), which rest upon the proposition that an injunction prohibiting political activity does not constitute state action.

But the foregoing conclusion does not determine the matter. This court's recent decisions repeatedly make the point that section 8 is implicated only when a law is directed at speech. *See, e.g., State v. Moyle,* 299 Or 691, 705 P2d 740 (1985); *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982). If a law is directed at conventional crimes or torts, sections 8 and 26 are not implicated, even though words may be uttered in connection with the crime or tort.

In contrast, *State v. Henry,* 302 Or 510, 732 P2d 9 (1987); *Crouch v. Central Labor Council, supra; Wheeler v. Green, supra;* and *Hall v. The May Dept. Stores, supra,* all

---

[23] The court in *Wheeler* stated:

"In the sensitive area of free expression, however, the threat of large damage recoveries can easily inhibit the exercise of freedom of constitutionally protected expression, as well as its abuse. This is likely to be particularly true in Oregon where the courts, having no power of remittitur, have little or no control over the amounts which juries award as punitive damages." *Wheeler v. Green,* 286 Or 99, 119, 593 P2d 777 (1979). (Footnote omitted.)

focused upon speech, not conduct or any other forbidden result.[24] *Henry* struck a statute that created and defined "the crime of disseminating obscene material" specifically because it was directed at speech. "Obscene speech, writing or equivalent forms of communication are 'speech' nonetheless," 302 Or at 525, and a statute aimed at suppressing such speech therefore directly implicated section 8.

*Crouch* upheld an injunction against picketing by a labor union, eliminating only that part of the injunction that barred defendants from publishing material concerning plaintiff in its newspaper. 134 Or at 620-21. That part of the injunction was aimed squarely and exclusively at the defendant's speech, not at any conduct, and, therefore, clearly implicated section 8. Similarly, *Wheeler* and *Hall* held that punitive damages awards are prohibited by section 8 in tort cases where speech was the gravamen of the tort. *Wheeler v. Green, supra,* 286 Or at 117-19; *Hall v. The May Dept. Stores, supra,* 292 Or at 146-47.[25]

In the circumstances of the instant case, an injunction consistent with this dissent would not violate defendants' constitutional rights under sections 8 and 26, because the injunction would be aimed at preventing a trespass rather than at speech or assembly.

## D. DEFENDANTS HAVE NO ARTICLE IV, SECTION 1, CONSTITUTIONAL RIGHT TO GATHER SIGNATURES AT THE CENTER

Irrespective of whether their activities are protected by Article I, sections 8 and 26, defendants maintain that they may not be inhibited in attempting to obtain signatures at the Center because of the initiative power provided by Article IV, section 1, of the Oregon Constitution. Article IV, section 1, reserves to the people initiative power "which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of Legislative Assembly." Defendants contend (1) that when they seek to implement

---

[24] As noted above, judicial action was at issue in *Crouch, Wheeler* and *Hall,* rather than a statute.

[25] While the above cases involved section 8, the same principles apply to section 26 because the question is the same—is the "law" directed against a forbidden result or against a constitutional right?

Article IV, of the Oregon Constitution by obtaining signatures upon the privately owned parts of the Center, they are exercising a legislative function; (2) that it is self-evident that the legislature could itself enact a law which provides that persons engaged in acquiring initiative petition signatures may do so in private shopping centers; and (3) that while exercising this function they are entitled to something like the prerogatives of a legislature, and can therefore gather signatures upon privately owned parts of the Center.

I do not find defendants' arguments persuasive. Initially, I note that defendants' analogy is misplaced. The signature-gatherers' function is like the proponent of a bill in the legislature. The voters of the state act like the legislature as they pass judgment on any measure that has enough strength to reach the state ballot.

Defendants' interpretation of Article IV, section 1, stretches too far as it presumes that section 1 is concerned with protecting an individual's right to gather signatures and that section 1 implicitly confers a right of access to private property over the objection of its owner.[26] The initiative provision set forth in section 1 is not expressed in terms of an individual right, but is reserved to the people collectively. This section of Article IV is not concerned with protecting the individual right to solicit signatures, that right is protected by Article I, sections 8 and 26. Unless and until the prerequisites of Article IV, section 1, have been complied with,[27] the ini-

---

[26] Carrying through on defendants' claim of right of access to private property, the initiative petition would obviate the necessity for consent by the property owner (such as homeowner) and eliminate the need for search warrants.

[27] For example, Article IV, section 1, of the Oregon Constitution requires, in part, that:

"(b) An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(c) An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"* * * * *

"(e) An initiative petition shall be filed not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon."

tiative power is not invoked. If Article IV, section 1, was intended to include a substantive right to gather signatures, it would have been expressed, especially if it were intended to afford greater individual rights in this regard than are already protected under Article I. *See Woodland v. Michigan Citizens Lobby, supra,* 378 NW2d at 349. Moreover, Article IV, section 1, is "silent as to the means of securing signatures," *State v. Campbell/Campf/Collins,* 265 Or 82, 90, 506 P2d 163, *appeal dismissed,* 414 US 803 (1973), and therefore does not affirmatively grant a right of compelled access to private property. This court should decline defendants' invitation to imply such a right. In sum, I reject defendants' arguments and hold that Article IV, section 1, of the Oregon Constitution does not create a right to gather signatures upon private property.

## E. CONCLUSION

The majority should, and I would, hold that defendants' signature-gathering activities upon the Center are trespassory and should be enjoined. Defendants do not have a constitutional right under Article I, sections 8 and 26, to gather signatures upon the Center. Sections 8 and 26, of Article I, are not directly implicated when a court issues an injunction, because those sections apply only when a "law" has been "passed." However, courts in this state are subject to the Oregon Constitution, and, therefore, may not issue orders which violate Article I, sections 8 and 26, of the constitution. An injunction enjoining defendants from soliciting signatures upon the privately owned parts of the Center does not violate Article I, sections 8 and 26, because the injunction is aimed at continuing trespass and stopping a nuisance rather than at prohibiting speech or assembly. Article IV, section 1, does not expressly bestow a substantive right to gather signatures, nor a right of compelled access to private property. Article IV, section 1, does not provide a right of access to private property to gather signatures over the property owner's objection. Accordingly, defendants' rights under the Oregon Constitution have not been violated. Plaintiff is entitled to a limited injunction prohibiting defendants from gathering petition signatures at the Center. Therefore, I would reverse the decision of the Court of Appeals and remand the case to the trial court for entry of an appropriate injunction.

Peterson, Chief Justice, joins in this dissenting opinion.